**Edna P. Wahl v. George K. Schmidt et al.**
**On appeal of George K. Schmidt, Surviving Executor, Appellant, v. Talitha H. Kellner et al., Executors of the Last Will and Testament of Barbara E. Kellner, Appellees.**

**Gen. No. 29,360.**

1. WILLS—*when extrinsic evidence resorted to in construing will.* In construing a will, the intention of the testator must control, and while the general rule undoubtedly is that such intention is to be gathered from an inspection and consideration of the will and from no other source, in case of latent ambiguity courts do and must listen to extrinsic evidence.

2. WILLS—*construction of provisions charging advancements.* Where a testator directed that two of his children should be charged with ten shares of certain capital stock advanced to them, and further directed that if he should make any similar advancement such advancement should likewise be deducted, as it was his wish that all of his children should be treated alike in all respects, and also directed that those of his children to whom or whose husbands any such shares should have been advanced, should be charged with the number of shares advanced; and where it appeared that the testator had in fact transferred one hundred shares instead of ten to one child and a like number to the husband of another, it was held that all parts of the will must be considered together to ascertain and give effect to the intention of the testator, and that said two children should be charged with one hundred shares each.

3. WILLS—*when words of will disregarded as in conflict with conditions of testator's estate.* In accord with the rule that the expressed intention of a testator will be given effect notwithstanding

the fact that verbal inaccuracies or false descriptions may also be found in the will, the word "ten" was eliminated as a false description of shares of stock actually advanced to or for certain children, and they were charged with one hundred shares each, as there was enough left in the will after eliminating the word "ten" to identify the advancements actually made and to show that the testator intended to charge such children with the whole of the advancements.

4. WILLS—*construction in determining date for valuation of advancements.* When the question of the value of an advancement arises in the construction of a will, the rule ordinarily applied in cases of intestacy, that the value is determined as of the date when the advancement was made, must necessarily yield to the intention of the testator, if a different intention appears from the language of the will; hence under a will directing that advancements shall be charged as though received at the time of distribution, the value of the advancement in question was charged at the price for which the stock sold, as, for the purpose of distribution, the value of such shares was fixed when they were sold.

5. PROBATE COURTS—*appealability of order permitting partial payment of attorney's fees by executors.* An order entered by the probate court on motion of the executors during the course of administration permitting them to make a specified payment to their attorney, to apply on his attorney's fees is not a final and appealable order where it does not purport to fix the fees or be based on any such order and it does not appear that any such order was ever made fixing the fees.

6. PROBATE COURTS—*scope of review by circuit court on appeal from order fixing fees of executors' attorneys.* Where the only order fixing a specific sum to be paid for attorneys' fees was that approving the final account, an appeal from that order to the circuit court gave that court jurisdiction to inquire into the whole question of attorneys' fees, notwithstanding the entry of a prior order permitting the payment of a stated amount to apply on attorneys' fees.

7. WITNESSES—*incompetency of witnesses as to admissions of deceased.* Where one defending against a claim was so defending as the legatee and legal representative of her husband, witnesses who were executors of the last will of the testator, whose estate was the claimant, were incompetent to establish the claim by alleged admissions of the defendant's husband.

8. EVIDENCE—*competency of ledger pages and trial balance.* Copies of pages from a ledger and of a page of a trial balance kept by a testator's bookkeeper were incompetent where the bookkeeper was dead and the original books were lost, in the absence of proof that the original entries from which the ledger entries were posted

were "true and just" and made in the usual course, as required by statute.

9. EVIDENCE—*when book entries competent by reason of other entries admitted.* The fact that book entries may have been competent as admissions against interest when offered as evidence *against* an executor, does not make other wholly disconnected entries admissible when offered *by* the executor, without proof of the correctness of such other entries.

10. ESTATES OF DECEDENTS—*conclusiveness of approval by probate court of settlement with debtor of estate.* Where a certain sum was withdrawn by a son from his father's account during the latter's illness and placed to the credit of a partnership composed of said father and son, and upon a dispute arising after the father's death as to the son's right to so act the son settled such dispute by an agreement with his coexecutors, with full knowledge of the other beneficiaries, and such settlement having been reported to the probate court and approved, it could not be overthrown after thirteen years by one of such beneficiaries; and the heirs of such beneficiary were in no better position than their mother, and the alleged fact that the mother's husband advised her that the settlement would be reconsidered at the final accounting could not be charged to the son.

11. ESTATES OF DECEDENTS—*appealability of orders on separate items in executor's accounts.* Each item in an administrator's account renders it a separate claim, depending alone upon its own merits, having no connection with other items, and the judgment upon it must then necessarily be a separate judgment from which an appeal may be taken.

12. PROBATE COURTS—*necessity of separate objection in probate court on separate items of executors' accounts.* Items as to which there was no hearing in or judgment by the probate court could not be considered on appeal to the circuit court, and the mere grouped insertion of such items as blanket items in the appeal bond did not give the circuit court jurisdiction thereof.

13. PROBATE COURTS—*extent of trial de novo on appeal to circuit court.* A trial *de novo* in the circuit court on appeal from the probate court means only that the case as presented to and tried by the probate court shall be tried *de novo.*

14. ESTATES OF DECEDENTS—*power of circuit court to allow amendments of executors' report not raised below.* Executors could not, in the circuit court by amendment to their final account, amend such account by seeking credit for items shown in trustees' accounts which should have been charged in the executors' account where such amendment sought to introduce issues not tried in the probate court, and upon which that court had entered no judgment of any kind.

15. APPEAL AND ERROR—*right to assign cross errors in Appellate Court not assigned in circuit on appeal from probate.* Where, on an appeal by an executor bringing up for review the action of the probate court in disposing of certain items in his final account, the assignment of errors made no mention of the matter of executor's commissions or of commissions on insurance, cross errors as to the rulings of the circuit court upon such matters could not be assigned in the Appellate Court.

Appeal by plaintiff from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding. Heard in the second division of this court for the first district at the March term, 1924. Affirmed in part, reversed in part, and remanded with directions. Opinion filed June 9, 1925. Rehearing denied June 23, 1925. *Certiorari* denied by Supreme Court (making opinion final).

MILLER, GORHAM, WALES & NOXON, for appellant.

WYMAN, HOPKINS, McKEEVER & COLBERT, for appellees; VINCENT D. WYMAN and AUSTIN L. WYMAN, of counsel.

MR. PRESIDING JUSTICE FITCH delivered the opinion of the court.

This appeal brings up for review the action of the circuit court on appeal from the probate court of Cook county in disposing of certain items in the final account of appellant as surviving executor of the last will and testament of Kaspar G. Schmidt, deceased.

Kaspar G. Schmidt died on December 10, 1898, leaving him surviving three married daughters and one son. The son is the appellant, George K. Schmidt. The daughters were Mrs. Barbara E. Kellner, wife of George W. Kellner (both now deceased), Mrs. Katherine Herbert and Mrs. Edna P. Wahl. By his last will and testament, Kaspar G. Schmidt appointed his son, George K. Schmidt, his son-in-law, George W. Kellner, and his nephew, Charles J. Schmidt, executors of his will and trustees of his estate, and devised and bequeathed to them all his property (subject to the payment of certain specified legacies and to a specific de-

vise of certain real estate to such of his grandchildren as might be living in 1915) in trust, to be held by them for a period of fifteen years after his death, during which period the net income of his estate was to be paid to his said four children, and at the end of that time to divide the residue of the estate among his children "one-fourth to each, after the irregularities now existing by reason of advancements shall have been adjusted."

The will is dated June 2, 1890. At that time the testator was a successful brewer in Chicago. Eight years before, in 1882, he had formed an Illinois corporation, called the K. G. Schmidt Brewing Company, having a capital stock of $350,000, divided into 3500 shares of the par value of $100 each. He subscribed for 3,395 shares, his son-in-law, Kellner (who entered his employ about that time), subscribed for 100 shares and another employee subscribed for the remaining five shares. Kellner never paid for his 100 shares, although a certificate therefor was at once issued to him. The testator paid for all the stock by transferring to the corporation the real estate, buildings and personal property then constituting his brewery plant and business. About a year later, the testator gave his second daughter, Mrs. Herbert, a certificate for 100 shares of his stock.

Less than a year after the will was executed, the testator effected a sale of all the stock of the brewing company to the Milwaukee & Chicago Breweries, Ltd., at the agreed price of $313.60 per share in cash, bonds and stock. The testator received in this manner over a million dollars for his shares, and Kellner and Mrs. Herbert each received $31,630 for the shares they held. The testator invested his share of the cash proceeds in real estate and mortgages on real estate, and as the average income therefrom received by his executors during the fifteen years following his death was approximately $50,000 a year, it is a fair inference that

no material part of such proceeds was lost during his lifetime.

About a year before he died, the testator caused one of his buildings, at the corner of two business streets in Chicago, to be fitted up with safety deposit vaults and equipped as a real estate office, and placed his son George in charge of the same, operating the vaults and conducting a general real estate, insurance and loan business under the name of "K. G. Schmidt & Son." After that, the testator spent much of his time on a farm he owned in Wisconsin.

The will was proved in the probate court in January, 1899, and the three executors and trustees entered upon the discharge of their duties. The testator had kept a set of personal account books for some years before his death and these books of account were used and continued by the executors and trustees as their books of account, in which all transactions pertaining to the large estate were entered. They kept but one bank account, in which all receipts, whether from personal property or from real estate, were deposited, and upon which all checks for expenditures were drawn.

It seems to have been assumed or understood by the executors and trustees that because of the provision of the will postponing the distribution of the estate for fifteen years there could be no final settlement of the estate in the probate court until the end of that time. Acting upon this assumption or understanding, the executors filed annual accounts in the probate court during all that time, and they also rendered and delivered annual itemized accounts as trustees to each of the heirs and made periodical payments to them out of the net income of the estate. In these accounts they endeavored to separate the items received and expended by them as trustees from those properly belonging to their accounts as executors. But the accounts show that the distinction was not always clearly recognized or observed, and this fact gave rise

later to bitter contention among the heirs. However, as we understand the evidence, the only objections filed to the executors' annual accounts were filed to the first and third of such accounts, all of which were approved by the probate court, and the annual accounts of the trustees were received by the heirs and the income payments accepted by them during all this period apparently without objection. In 1906, George W. Kellner died and the annual accounts were thereafter rendered and filed in the same manner by the two remaining executors and trustees until 1914.

On November 10, 1914, the two surviving executors filed their final account in the probate court. Objections thereto were filed by Mrs. Kellner and Mrs. Herbert. The account was amended several times and extended hearings were had in the probate court upon the objections filed. Finally, in December, 1915, the final account, as amended and corrected to meet the views of that court, was approved. It contained over 1,200 items of receipts and disbursements, aggregating $1,744,628, which had been received and paid out in the course of over sixteen years of administration. From the order approving the final account and directing distribution to be made of the remaining personal property of the estate, seven separate appeals to the circuit court were perfected. These appeals covered more than half of the items of the account.

Meantime, Mrs. Wahl had filed a bill for partition in the circuit court and the two then surviving trustees filed a cross-bill to settle their accounts as trustees. About the same time, Mrs. Kellner filed a bill against such trustees for an accounting. After these suits were at issue, an order was entered in March, 1916, consolidating these bills and cross-bills and the seven appeals from the probate court, under the general title of *Edna P. Wahl v. George K. Schmidt et al.*, and the consolidated cause was referred to a master in chancery to take proofs and report his conclusions. Proofs were not finally closed before the master until

October, 1918, when over 7,000 typewritten pages of testimony had been taken. Arguments were heard before the master extending until May, 1919, when the cause was taken under advisement by him. His term expired in December, 1920, but by agreement an order was entered continuing him as special commissioner, and his completed report, filed in June, 1922, is now shown in a printed volume of 225 pages. For the most part, the special commissioner's conclusions and recommendations were adopted by the circuit court in the decree which was entered in December, 1923. Meantime, Charles J. Schmidt, one of the executors and trustees, died in April, 1918, and Mrs. Kellner died in 1919. Appellees are the executors of her last will and testament.

The decree is in three parts. The first part restates the accounts of George K. Schmidt as surviving executor, orders him to pay to appellees the share of George W. Kellner in the executors' commissions which were allowed, directs payment of the amount due upon a judgment obtained by said Kellner against the estate in 1904, and directs the payment to appellees of $62,586.22 as the balance due upon Mrs. Kellner's distributive share of the personal estate of her deceased father. The second part of the decree restates the trustees' accounts and the third part relates to the master's and special commissioner's fees. Only the first part of the decree is involved on this appeal, other portions of the decree being the subject of a writ of error in this court, *post,* p. 428, in which an opinion will be filed at the same time this opinion is filed.

The errors and cross errors assigned on this appeal —so far as the same have been argued in the briefs of counsel—question the correctness of the first part of the decree as to such matters only as are hereinafter specifically mentioned. It is stated in the briefs that the claims of Mrs. Herbert and Mrs. Wahl have been settled, leaving only the claims and interests of appellant, on the one side, and those of the legal representa-

tives of Barbara Kellner, deceased, on the other side, of the controversies involved in this appeal, to be considered and determined.

### As to advancements of stock.

The seventh clause of the testator's will directs that at the expiration of fifteen years after his death the residue of his estate shall be divided "share and share alike among my four children" (naming them), and then proceeds as follows:

"But I also direct that the shares of my daughters Barbara Elizabeth Kellner and Katherine Herbert shall be charged with ten shares of the capital stock of the K. G. Schmidt Brewing Company and $6,000 in cash each, I having heretofore advanced such amounts to them or their respective husbands; and if hereafter I shall make any similar advancement to them or to either of my other two children, I direct that such advancement shall in like manner be deducted from his or her distributive share of my estate, it being my wish to treat all my children alike in all respects.

"And in the distribution of my estate I direct that my shares of the capital stock of the K. G. Schmidt Brewing Co. shall be divided in kind, and that those of my children to whom or to whose husband any shares of said stock shall have been advanced as aforesaid, shall be charged with the number of shares advanced the same as though they were received at the time of such distribution.

"And during the said period of fifteen years I direct that all of the net income of my estate shall be paid to my said children in the same proportion in which they will share in the final distribution of my estate, that is, one-fourth to each after the irregularities now existing by reason of advancement shall have been adjusted."

The record shows without dispute that the only advancements of stock in the brewing company ever made by the testator to his daughters were the 100 shares he gave Mrs. Herbert, and the same number of shares which he gave indirectly to Mrs. Kellner,

through her husband, at the time the corporation was organized as above stated. As to the latter, the special commissioner reported that "as the testator paid for these shares with his property and caused them to be transferred to Kellner, it must be concluded that the latter received them as a gift from the testator," and this finding was approved by the decree of the circuit court. That the testator so considered the matter is also shown by the two sentences above quoted from his will, referring to his daughters and the husband of each. Neither of said daughters had any other stock in the brewing company.

As approved by the probate court, the final account charged the distributive shares of Mrs. Kellner and Mrs. Herbert with the value of all the brewery stock received by them from the testator. The decree of the circuit court charged each of such distributive shares with the value of only ten shares of the brewery stock, based upon the amount the testator had paid for one-half of the property he transferred to the corporation when it was organized. In support of the decree, appellees contend, in substance, (a) that there is no apparent inconsistency or repugnancy in the provisions above quoted, that the language on its face is plain and unambiguous, and therefore, it is said, extrinsic evidence of the circumstances surrounding the testator at the time the will was drawn is not admissible; and (b) that as the first paragraph above quoted specifically directs that the distributive shares of Mrs. Kellner and Mrs. Herbert shall each be "charged with ten shares" of brewery stock, which the testator there states he had "advanced to them or their respective husbands," and as there is no *specific* statement in the will directing the other 90 shares to be charged to them as advancements, therefore it must be assumed or concluded that the testator did not intend that such other shares should be so charged.

(a)  As to the first of these contentions, while upon its face the language of the will above quoted seems to

be unambiguous and each provision appears to be consistent with all the other provisions as to advancements, yet when all such provisions are considered in the light of the extrinsic evidence above mentioned a latent ambiguity as to the intention of the testator regarding these matters is shown to exist. Part of this evidence was stricken, erroneously, we think, on motion of appellees.

The rule is too well settled to require the citation of authorities that in construing a will the intention of the testator must control; and "while the general rule undoubtedly is, that the intention of the testator is to be gathered from an inspection and consideration of the will, and from no other source, in case of latent ambiguity courts do and must listen to extrinsic evidence,—not for the purpose of contradicting or adding to the terms of the will, nor to wrest the words of the testator from their natural operation, but for the purpose of determining the existence or nonexistence of latent ambiguity (for a latent ambiguity can only be shown by extrinsic evidence), and for the further purpose of enabling the court to look upon the will in the light of the facts and circumstances surrounding the testator at the time the will was made, whereby to determine the intention of the testator." (*Decker v. Decker,* 121 Ill. 341, 350.) This rule as to the admissibility of extrinsic evidence in cases of latent ambiguity in a will is also recognized in many later cases, among which are *Whitcomb v. Rodman,* 156 Ill. 116; *Johnson v. Askey,* 190 Ill. 58; *Graves v. Rose,* 246 Ill. 76; *O'Hare v. Johnston,* 273 Ill. 458, 466; *Cochran v. Cochran,* 277 Ill. 244, 254; *Alford v. Bennett,* 279 Ill. 375, 384; *Johnston v. Gastman,* 291 Ill. 516; *Brown v. Ray,* 314 Ill. 570, 581. In *O'Hare v. Johnston, supra,* the court said: "The intention of the testator is found by construing the words employed in the will itself in the light of his circumstances and surroundings. * * * The court should, so far as possible, in the light of these circumstances, place itself in the

position of the testator at the time the will was drawn, and be guided by the light thus thrown on the testamentary scheme to assist in arriving at the intention of the testator.''

(b) If the first sentence above quoted, in which ten shares of brewery stock are mentioned, was the only language in the will referring to brewery stock advanced by the testator, the contention of appellees that the testator intended that two of his daughters should be charged with advancements of only ten shares each, although he gave them each 100 shares, might be conceded. But this sentence is not the only provision in the will on that subject. There are several others, all of which the argument of appellees ignores or casts aside as having no effect whatever. Yet, under another cardinal principle in the construction of wills, all parts of the will must be considered together in order to ascertain and give effect to the intention of the testator.

The same paragraph which uses the words ''ten shares'' states that if the testator shall ''hereafter'' make ''any similar advancement,'' such advancement shall *''in like manner* be deducted from his or her distributive share * * * *it being my wish to treat all my children alike in all respects.''* The fact that no similar advancement was made thereafter is beside the point, which is the ascertainment of the testator's intention as to advancements as manifested by all the language used in the will, when considered in the light of the facts existing at the time the language was used by him.

Again, in the next paragraph, the testator provides for a distribution of his brewery stock in kind, and directs that in such distribution ''those of my children to whom or to whose husband *any shares* of said stock shall have been advanced as aforesaid, shall be charged with *the number of shares advanced* the same as though they were received at the time of such dis-

tribution.'' While the fact that the stock was all sold before the testator's death prevented a distribution in kind, it does not affect the value of this declaration in the will as evidence of the testator's intention that all shares of the brewery stock he had advanced should be so charged.

Again, as if to remove any lingering doubt as to his expressed intention to "treat all his children alike" in this matter of advancements, the will further provides, in the third paragraph above quoted, that during the fifteen years' period prior to the distribution of the body of the estate the net income therefrom shall be paid to the children *"in the same proportion in which they will share in the final distribution of my estate, that is, one-fourth to each after the irregularities now existing by reason of advancements shall have been adjusted."* The only "irregularities" then "existing by reason of advancements" were the irregularities caused by the advancement of *100* shares of brewing company stock and $6,000 in cash to each of the two daughters named; and the only possible way to adjust such irregularities so that each of the children should receive one-fourth of the residuary estate after such "irregularities" were "adjusted" was to ascertain the total amount of the residuary estate for distribution, including all such advancements, and then divide the total thus found by four. The quotient would be the amount of the distributive share of each of the children to whom no advancements had been made, and the same quotient, less the amount advanced to each, would be the amount of the distributive share of the children to whom advancements had been made. From these amounts the "proportion" of the net income to which each child was entitled could be readily computed.

All of these later provisions of the will are not only inconsistent with the earlier provision, when read in the light of the facts as they existed at the time the will was drawn, but they are wholly at variance with

it, for they repeatedly and clearly express an intention on the part of the testator to equalize the distributive shares of his children by charging them with the brewery stock and cash he had advanced to them, which intention cannot be carried out if only a part of such advances be so charged.

By the decree appealed from the testator's thrice repeated intention to treat all his children alike in the distribution of his estate is defeated and two of his children are allotted a much larger share than the others, merely because in one sentence of the will the description of the amount of brewery stock he had advanced was inaccurately stated. It is idle to speculate as to what may have caused this misdescription. It is enough to know there was in fact such a misdescription. This, we think, is clearly shown by the language used in the later parts of the will.

There is abundance of authority for the view that the expressed intention of a testator will be given effect notwithstanding the fact that verbal inaccuracies or false descriptions may also be found in the will. In *Whitcomb v. Rodman, supra,* the court quotes the language of Chief Justice Marshall in *Finlay v. King's Lessee,* 3 Pet. (U. S.) 346, as follows: ''The intent of the testator is the cardinal rule in the construction of wills, and if that intent can be clearly perceived, and is not contrary to some positive rule of law, it must prevail, although in giving effect to it some words should be rejected or so restrained in their application as materially to change the literal meaning of the particular sentence.''

One of the most recent applications of the principle so expressed is found in the case of *Cronin v. Cronin,* 314 Ill. 345. There the testator devised the remainder, after a life estate in his wife, to a certain son ''in fee simple absolute, forever,'' but in a codicil the testator required such son, *as ''a condition precedent to his taking the land,''* to make certain payments within two years after his wife's death. The court held that a

fee simple title passed to the son notwithstanding the words of the codicil. In one part of the opinion the court said: "In construing wills we have adopted as a rule of this court that the intention of the testator, if clearly disclosed by the will, must prevail, even though some words must be rejected. (*Rose v. Hale,* 185 Ill. 378.)"

In the case of *Rose v. Hale, supra,* thus referred to, the court rejected the word "thirdly" found in the will in order to combine into one sentence the second and third clauses of the will and thereby give effect to the evident intention of the testator as expressed in the remainder of the will. This was done upon the authority of *Whitcomb v. Rodman, supra,* and *Huffman v. Young,* 170 Ill. 290.

In the *Huffman* case, *supra,* the words "off the east side" were stricken out of a devise of a tract of sixty-two and one-half acres of land, where it appeared by extrinsic evidence that all the land the testator owned in that section was sixty-two and a half acres *in the north end* thereof.

In *Whitcomb v. Rodman, supra,* the rule was laid down that: "While words cannot be added to a will, yet in arriving at the intention of the testator, as has been shown by the authorities, so much as is false in the description of the premises devised may be stricken out, and, after striking out the false description, if enough remains to identify the premises intended to be devised, the will may be read and construed with the false words eliminated therefrom." Other cases similar to that of *Whitcomb v. Rodman, supra,* are *Decker v. Decker, supra; Collins v. Capps,* 235 Ill. 560; *Gano v. Gano,* 239 Ill. 539; *Graves v. Rose,* 246 Ill. 76; *Alford v. Bennett, supra; Johnston v. Gastman,* 291 Ill. 516; *Stevenson v. Stevenson,* 297 Ill. 338, and *Brown v. Ray,* 314 Ill. 570.

Applying these principles to the facts of this case, if the word "ten" found in the first paragraph above

quoted be "omitted from consideration in arriving at the true construction of the will" (as was done in *Rose v. Hale, supra,* and the similar cases above cited), or is "eliminated" as a "false word" from the description of the advancements actually made by the testator (as was done in *Decker v. Decker, supra,* and the similar cases above cited), there is enough left in the will, after that word has been rejected or eliminated, to identify the advancements of brewery stock the testator had in fact made to his two daughters and to show that the testator intended to charge their distributive shares with the whole of such advancements.

We are therefore of the opinion that the decree of the circuit court is erroneous in not charging the distributive share of Mrs. Kellner · with 100 shares of brewery stock advanced, instead of ten.

The question then arises upon this part of the decree: What value should be charged for the hundred shares of stock so advanced? It is conceded that ordinarily the value of an advancement, *in cases of intestacy,* is determined as of the date such advancement was made. But when the question arises in the construction of a will, this rule must necessarily yield to the intention of the testator, if a different intention appears from the language of the will. (40 Cyc. 1924.)

The will provides that the testator's brewery stock shall be distributed in kind and that in such distribution each of his children to whom "any shares" of stock shall have been advanced "shall be charged with the *number* of shares advanced *the same as though they were received at the time of such distribution.*" While this language clearly shows that at the time the will was drawn the testator had no intention of selling his brewery stock, yet, as he made no change in his will after the brewery was sold, it seems equally clear that he intended this provision to apply to the distribution of the proceeds received from the sale of such shares. If the brewing company had not been

sold, then, by the terms of the will, the *number* of shares advanced, regardless of their value, would have been the determining factor in the distribution; which is the same thing, in effect, as giving all the shares the same value per share in the distribution thereof. As all the stock was sold at the same time and for the same price per share, this expressed intention of the testator can still be carried out—and can only be carried out—by charging the value of the advancements of brewery stock at the amount for which they were sold. The evidence shows that Mr. Kellner received $31,360.30 for his shares at the time of the sale, and we think the distributive share of Mrs. Kellner should be charged with that amount. For the purposes of distribution, the value of such shares was fixed when they were sold, and that value remained the same until the proceeds of the testator's shares were distributed. The rule of equality in the distribution as expressed by the testator is thereby given effect, and is the only manner in which it can be made effective.

*As to attorney's fees.*

In the final account as approved by the probate court on December 17, 1915, appears the following item:

"Paid to Joseph A. O'Donnell, attorney for the Executors, for his services rendered in the Probate Court of Cook County from December 10, 1898, to September 1, 1915, the sum of $35,000; which sum was fixed by the decision of the Probate Court of Cook County rendered on September 1, 1915, as the sum to be paid to him for his services from December 10, 1898, to the date of said decision; on which amount he was heretofore paid from December 10, 1898, to June 15, 1914, the sum of $13,750.18, to apply on account of such services; and on which account a further payment of $7,850, to apply an account of said services, was made to him on October 6, 1915, pursuant to the order of this court entered September 29, 1915, leaving a balance due Mr. O'Donnell for attorney's

fees under the decision of said Probate Court of $13,399.81, a receipt for which sum is herewith presented and filed.''

From the allowance of this item Mrs. Kellner appealed to the circuit court. The special commissioner found, after taking a great deal of testimony on the subject, that all of Mr. O'Donnell's services were worth not to exceed $22,150.18 (being $8,400 in addition to the amount he had received prior to October 6, 1915), and recommended that the balance of the $35,000 allowed by the probate court, to wit, $12,849.81, be disallowed and charged back to the executors with interest. The decree of the circuit court followed the special commissioner's recommendation.

In the reply brief of appellant's counsel, it is said: ''The sole questions on this part of the appeal are whether the order of September 29, 1915, was a final and appealable one, and if it was, whether the court could subsequently reduce the amount allowed by that order.'' The order of September 29, 1915, was an order entered in the probate court on motion of the executors permitting them to pay to Mr. O'Donnell the sum of $7,850 ''to apply on his attorney's fees as such attorney for such executors, *as fixed by the court.*'' There was no appeal from that order. The order also directs the payment to *Mrs. Kellner,* George K. Schmidt and Charles J. Schmidt of $8,250 ''to apply on their fees as executors,'' and there is a dispute between counsel as to whether Mrs. Kellner, or her attorney, was present when the order was entered. Be that as it may, the order does not purport to be a final order, and in our opinion it was not appealable. The order does not purport to state what amount had been ''fixed by the court'' or when or where any amount had been so fixed. Ordinarily, the probate court does not fix the amount to be paid by an executor to his attorney for fees, except by approving the account of the executor showing the payment of such fees. This practice was apparently followed in

this instance. The record shows that no order was ever entered in the probate court fixing any specific sum as the total amount to be paid for attorney's fees except the order of December 17, 1915, approving the account containing the item quoted above. That order was appealable and was appealed from. The words "as fixed by the court" in the order of September 29, 1915, doubtless mean the same thing that is recited in the final account, viz., that on September 1, 1915, the probate court had *decided* that Mr. O'Donnell was entitled to be paid $35,000 for his services. But no order to that effect was *then* entered, and no final payment on that basis was approved, until the order appealed from was entered. We are of the opinion that the appeal gave the circuit court jurisdiction to inquire into the whole question of attorney's fees, which it did. Appellant's counsel state that on account of the large expense involved they did not bring up the 2,000 pages of testimony taken upon the question of the reasonableness of the allowance of attorney's fees. Hence, that question is not before us on this appeal. The decree of the circuit court as to this item must therefore be affirmed.

## The George W. Kellner book account.

In the probate court, the claim was made by the then surviving executors that at the time of the testator's death George W. Kellner was indebted to him for money loaned. No such claim against Kellner was ever inventoried by the executors, and when Kellner died in November, 1906, no action had been taken by the executors to enforce the payment of any such claim. No such claim was ever filed against the estate of George W. Kellner, deceased. Two years before Kellner's death, he recovered a judgment against the estate for $1,385, and ten years later, in 1914, Mrs. Kellner, as the executrix of his last will and sole legatee thereunder, filed a transcript of said judgment

in the probate court, and the probate court ordered it paid, with interest. The final account, as approved by the probate court, charged the distributive share of Mrs. Kellner with the "amount due estate on book account of George W. Kellner in the sum of $4,546.79" and interest thereon from the date of the testator's death to the date of the death of George W. Kellner, as a set-off against the amount due to Kellner on his judgment, and against the sum of $5,500 fixed by the court as his share of the executors' commissions. The special commissioner found, in substance, that there was no competent proof in the record of the alleged book account against Kellner, and the circuit court disallowed the item of set-off.

Counsel for the executors attempted to establish their claim by the testimony of George K. Schmidt and of Charles J. Schmidt as to alleged admissions of liability made by George W. Kellner to them in his lifetime. As Kellner was dead and as Mrs. Kellner was then defending this claim as the legatee and legal representative of her deceased husband, neither George K. Schmidt nor Charles J. Schmidt was a competent witness as to such alleged admissions of George W. Kellner. Appellant concedes that "conversations with Kellner would not bind Mrs. Kellner, on the question of advancements, without additional proof of his agency."

Then counsel for the estate sought to prove the claim by offering pages from two ledgers, and a page of a trial balance book, kept by the testator's bookkeeper. The books of original entry, from which the items shown in the ledgers and trial balance book were presumably copied, were lost and the bookkeeper was dead. It might be inferred, perhaps, that the ledger entries were made by the deceased bookkeeper, but there was no proof that the original entries, from which the ledger entries were posted, were "true and just" and made in the usual course, as required by statute. Objections to the offered evidence were sus-

tained, and after carefully considering the arguments of appellant's counsel, we think it was not error to sustain them. It is true that certain other entries in the same books were offered on another branch of the case by the attorney for Mrs. Kellner and were admitted in evidence, when so offered, after proof that George Schmidt had admitted the books were correct. But the fact that such entries may have been competent as admissions against interest, when offered as evidence *against* the executor, does not make other wholly disconnected entries admissible when offered *by* the executor, without proof of the correctness of such other entries. We are unable to agree with appellant's counsel that there was any error in these rulings, and the order of the circuit court disallowing this item of the final account is therefore affirmed.

### *The partnership and the item of $15,000.*

The special commissioner reported, in substance, that in 1897 the testator installed safety deposit vaults and fitted up an office in one of the buildings, in which he and his son, under the name of ''K. G. Schmidt & Son,'' began to do business; that they operated the safety deposit vaults and prepared to do a general real estate, loan and insurance business; that the testator was anxious to set up his only son in business, and this was his motive in organizing the business mentioned; that by adopting the firm name and by direct statements to friends and acquaintances, he held out to the world that his son was his partner; that he furnished all the capital necessary to equip the safety deposit vaults and the office and to get the business started, and thereafter allowed George to run the business with little supervision on his own part; that the firm had no separate books of account and no bank account of its own; that all its transactions were recorded in the testator's individual books and all receipts went into his individual bank account, upon

which checks were drawn for all the expenditures; that George was given authority to sign the testator's name, by himself, to such checks; that no written articles of copartnership were prepared nor is there any other direct proof as to the respective interests of father and son in the firm; but from all the circumstances, the special commissioner concluded that George was given a half interest in the assets and profits of the business, with the understanding that no matter what the profits were he should be permitted to draw $100 per month; that: "It was not a business-like arrangement"; that "George had and was intended to have the best of it"; and that "his half interest in the assets of the business was a gift from his father."

While appellee has assigned cross errors upon that part of the decree which in effect approves these findings, we are of the opinion, after a careful examination of the evidence, that such findings are fully supported by the evidence, and therefore that such cross errors are not well assigned. The testimony of the testator's old friends cannot all be treated as unreliable, as is done in the argument of appellees' counsel, nor can such significant facts as the name given to the firm by the testator be ignored.

A more difficult question arises upon the following facts appearing from the record: On December 1, 1898, the testator suffered a stroke of apoplexy, became unconscious and remained so until his death nine days later. On Deecmber 2, 1898, his son withdrew from his father's bank account $15,000 in cash. The check was made out by the testator's bookkeeper, to the order of "cash," was signed in the usual way, viz.: "K. G. Schmidt, By G. K. S.," and was indorsed by George.

Naturally, this action of the son raised a storm in the family, when they were informed of it by him after his father's death. But the son claims and, as we understand the record, always has claimed that he was

expressly authorized by his father to draw such a
check at any time, to provide working capital for the
partnership. Appellees made an attempt to show that
the son admitted, in the probate court in 1915, that
when the partnership was formed he had no financial
interest therein. Thereupon, appellant proved all that
was said by him on that occasion. The master erro-
neously struck out that part showing that appellant
had testified that on the day of the formal "opening"
of the business, his father told him to draw such a
check. There is also the testimony of at least one
witness—an old friend of the testator—to the effect
that the testator said he had put $15,000 into the busi-
ness in addition to the cost of the equipment.

A month after his father died, the son opened a
bank account in the name of K. G. Schmidt & Son, with
a deposit of $15,000. On February 6, 1899, as the sur-
viving partner of that firm, he filed in the probate
court a verified inventory of the assets and liabilities
of said partnership, the assets consisting of office,
bank and safety deposit vault fixtures, and $15,000
"cash in bank," and the liabilities amounting to
$16.40. The partnership property so inventoried was
thereupon appraised by appraisers appointed by the
probate court at $3,584.50. The attorney who repre-
sented Mrs. Herbert at that time testified that when
the inventory and appraisement were presented for
approval, there was a hearing of some sort in the pro-
bate court, at which George Kellner, among others,
was present; and the record shows that both were
approved by the probate court on July 11, 1900.

The record further shows that on December 9, 1901,
an order was entered in the probate court, on motion
of Mrs. Herbert, requiring the executors to file an
account current, "showing the condition of said estate
and report in detail *showing settlement with the sur-
viving partner* of the copartnership of K. G. Schmidt
& Son"; and that in compliance with this order, the
executors filed their third annual account and report

on January 9, 1902. This account is signed by all the executors, *including George W. Kellner,* and shows that in December, 1901, the executors collected from George Schmidt, in two items, $599.50, as interest from the date of the approval of the partnership inventory to the date of said account, upon $9,367.44 *"partnership settlement."* A report was filed at the same time, and both account and report were approved. The report is now missing from the files, but the special commissioner gave its substance in his report, viz., that on December 10, 1901, an agreement was made between George Schmidt and his coexecutors, whereby "the interest of the estate in the assets of the partnership was fixed at $9,367.44, practically one-half the value of said assets, which sum was charged against George's distributive share," and at the same time he paid the interest above stated. George Schmidt testified that he told Mrs. Kellner the dispute had been settled in this manner and that she expressed her satisfaction that it had been settled. She denied having such a conversation with George, but admitted that she knew her husband had copies of all the annual accounts, which, she testified, he was accustomed to talk over with her. From the whole record, there can be no question that she was fully informed of the settlement made by her husband and did not openly object to it. So far as the record discloses, the matter was never again referred to in any way between the Kellners and George Schmidt from that time until the final account was presented—*a period of thirteen years.*

In the final account as approved by the probate court, the distributive share of George K. Schmidt was charged with the sum of $9,367.44, as thus agreed to in 1901, with interest thereon at the rate of 5 per cent per annum from that time to the date of the final account.

In the circuit court, the special commissioner found that although the testator had expressed an intention

of putting $15,000 into the partnership, he never in fact had carried out that intention, and recommended that George Schmidt's distributive share be charged not only with the amount agreed upon in 1901 as the interest of the estate in the partnership assets, but $7,500 more, with interest thereon at the rate of 10 per cent per annum from and after two years and six months from the date of the letters testamentary, i. e., from July 17, 1901. The decree appealed from goes beyond even this recommendation, and adds to this over $3,000 more for *compound* interest.

Upon this state of facts, appellant contends that the withdrawal of the $15,000 from the testator's bank account was shown to be lawful, and the amount so withdrawn was partnership assets; but that even if the evidence is not sufficient to sustain that theory, the order of the probate court approving the third annual account and report, and thereby approving the "partnership settlement" therein referred to, was a final order which was conclusive against the heirs having notice thereof, in the absence of fraud, mistake or collusion. To these contentions appellees reply by asserting that there never was a partnership, that the $15,000 was "abstracted" by the son from his father's bank account, that the finding of the master that this "was not done secretly" was an "unjustifiable whitewash," that appellant "would have gobbled the whole estate if he could" and knew that George Kellner intended to question the settlement when the final account was presented (although admitting there is no evidence that he *said* anything to George Schmidt on the subject after making the settlement with him), and that "it is mere persiflage to talk of *laches* or to imagine George K. Schmidt might have had more witnesses in 1902 than in 1915."

After carefully considering all that is said in the briefs of counsel on this subject, we are of the opinion that the vital question to be here determined is not so much whether George Schmidt was in fact authorized

by his father to draw $15,000 out of his father's bank account (although there is direct, competent and uncontradicted evidence that he was so authorized), but whether, having done so openly under a bona fide claim of right and authority so to do, and having had a dispute with his sisters about it, and having settled such dispute by an agreement with the other executors, made with the full knowledge of his sisters and without any open objection on their part, and such executors, one of whom was Mrs. Kellner's husband and her agent in these matters (as she herself testified), having reported such settlement to the probate court and obtained its approval thereof, the settlement so made may be attacked and overthrown by Mrs. Kellner after thirteen years of silence on her part. To this question, we think there can be but one answer, and that in the negative.

In reaching this conclusion, we are not unmindful of the rule that the approval of an executor's annual account is usually *ex parte,* and such accounts are ordinarily open to correction when the final account is presented. It is questionable whether the usual rule in this respect can have any proper application to such an unusual period of administration as in this case. But we do not rest our conclusion upon the fact that the third annual account and report were approved, although it is true that they were approved only after full notice to the heirs, and were not therefore merely *ex parte,* and their approval was not merely *de bene esse,* in the usual sense. Our conclusion is based upon the undisputed fact that there was a bona fide dispute as to the right of George Schmidt to retain money he had received during his father's lifetime and which he claimed was partnership property, that such dispute was settled and interest on the amount agreed on was paid to the executors, that the settlement was approved by the probate court, after due notice to Mrs. Kellner, upon the motion of all the executors, one of whom was her husband and agent,

and that with full knowledge of the facts, and being under no disability whatever, she took no steps of any kind to have such settlement set aside or the matter reopened until after the lapse of thirteen years. If she or the executors had brought any kind of an action or proceeding in 1914 against George Schmidt for the recovery of this money, such action or proceeding would have been barred by the statute of limitations, if the action was at law, or by *laches,* if the suit was in equity. Appellees are not in any better position, certainly, to question, so long after it was made, a settlement made in 1901 by their father and which, with the knowledge and acquiescence of their mother, was approved by the court at his instance and request.

It is contended by appellees that they should not be barred from questioning the settlement at this time because of the evidence to the effect that Mrs. Kellner was repeatedly advised by her husband in his lifetime that the whole question would be open for reconsideration when the final account was presented in the probate court. If George Schmidt had known she was receiving such advice, perhaps there might have been some sort of moral obligation on his part as executor to contradict Kellner. But there is no evidence that he knew that fact, or that he, either as executor or individually, ever gave Mrs. Kellner any advice. The claim that was settled was not one against George Schmidt, as executor, but was against him individually, for money he received during the testator's lifetime. George Kellner's advice, under these circumstances, cannot be charged to George Schmidt, nor excuse Mrs. Kellner's delay. Furthermore, George Kellner died in 1906, and the settlement made with him was not questioned for eight years thereafter. We fail to see any merit in this contention.

Since the settlement of 1901 and the approval thereof by the probate court amounted, in effect, to a judgment in favor of the estate against George K. Schmidt, individually, for $9,367.44, payable out of his distribu-

tive share of the estate, it follows that his distributive share is chargeable only with that amount, and interest thereon at the rate of 5 per cent per annum from the date of such settlement, as was held by the probate court. The decree of the circuit court as to this item and the interest items based thereon and connected therewith will be modified accordingly.

## The so-called blanket appeal items.

In *Morgan v. Morgan*, 83 Ill. 196, it is said: "Each item in the administrator's account rendered is a separate claim, depending alone upon its own merits, having no connection with other items. The judgment upon it must, then, necessarily be a separate judgment, from which an appeal may be taken." In *Curts v. Brooks*, 71 Ill. 125, it was held that upon an appeal from the probate court as to certain items of a final account, the circuit court only acquires jurisdiction to try the issues raised as to such items and cannot try any question that may arise as to any other items of the account, for the reason that no appeal having been taken from such other items, the probate court had the power, and it was its duty, to proceed to make a distribution of all the funds in the hands of the administrator, except a sum equal to the amount of the items involved in the appeal. These principles have been followed or recognized in the following later cases: *Millard v. Harris*, 119 Ill. 185; *Marshall v. Coleman*, 187 Ill. 556, 585; *Peterman v. U. S. Rubber Co.*, 221 Ill. 581, 587; *Whittemore v. Coleman*, 239 Ill. 450, 452, and *Elder v. Whittemore*, 51 Ill. App. 662, 666.

Following this recognized practice, the appeal bond given by Mrs. Kellner on her appeal from the probate court approving the final account enumerated over 800 items to which she objected. In addition to these items, the bond contained two items not shown on the account, as follows:

"Income on assets of estate shown by final
account and not accounted for by execu-
tors ...............................$15,000.00."
"Miscellaneous income not accounted for.$20,000.00."

These items are denominated in the briefs of appellant's counsel and in the master's report as "Mrs. Kellner's blanket appeal items." Her counsel do not claim that in the hearings that were had in the probate court, extending over a period of a year and a half, any evidence was offered tending to show that any such amounts or any part thereof had been omitted from final account.

When the matter reached the special commissioner's office, appellees' counsel offered evidence tending to prove that the executors had failed to charge themselves with sundry items of principal and interest which it was claimed they had collected, or failed to collect, from Mrs. Herbert, from George Schmidt and from other parties, aggregating $15,850.49. Following the rule stated in the cases last above cited, the special commissioner reported that in his opinion the circuit court had no jurisdiction to inquire into these matters, as there had been no hearing or judgment upon the same in and by the probate court. The decree of the circuit court, however, reversed this ruling of the special commissioner and surcharged the executors' account with all these items.

We are of the opinion that the decree is erroneous in this respect and that the special commissioner's recommendation should have been approved and followed by the court. A careful reading of the decisions above mentioned shows, we think, that the circuit court has no jurisdiction on such an appeal to inquire into any matter that was not first presented to and adjudicated by the probate court. The jurisdiction of the probate court in these matters is original; that of the circuit court is appellate only; and while the statute says that the case shall be tried *de novo* in the circuit court, that obviously means only that the case as

presented to and tried by the probate court shall be tried *de novo*. In the probate court, not all of the items of the account were objected to, and the hearing in that court was necessarily upon the specific objections made to the account as filed. The only issues made or tried in the probate court were upon such objections or exceptions. If the objectors desired to question the completeness of the account, it was their duty to say so by some form of objection or exception. This was not done. It follows, we think, that as there was no hearing in the probate court with reference to any such omissions, there was no judgment of that court upon such matters from which to appeal, and the mere insertion in the appeal bond of the two items above quoted did not give the circuit court jurisdiction to inquire into the question whether there had been such omissions. (*Elder v. Whittemore, supra.*)

### The so-called Item X.

When the extended hearings in the probate court were practically ended, the executors asked leave to amend the account by inserting therein the following item:

"Amount of income arising from, and disbursements relating to executors' accounts credited to and disbursed by or charged against trustees and shown in trustees' accounts; which amounts should have been credited to and disbursed by executors from December 10, 1898, to December 10, 1913............$23,743.98."

It appears from the report of the special commissioner that when this item was thus added to the final account, counsel for the executors told the probate court that the auditors who had been working on the books and the trustees' and executors' annual accounts had discovered that the distribution of the income was incorrect and had not been properly segregated

into trustees' income and executors' income, and that to ascertain the exact details of the errors which had produced this result would require a complete reaudit of the books and take from thirty to ninety days' additional time; that "neither the beneficiaries nor the court were willing to grant a further extension of time," and that thereupon, at the suggestion of counsel for the beneficiaries, the probate court allowed the item (which the commissioner denominated "Item X") and Mrs. Kellner appealed from such allowance.

The commissioner reported that upon the hearing before him he sustained objections to certain evidence offered by the executors in support of this item, which evidence, while tending to prove that the executors had made sundry errors in their final account to their disadvantage, did not tend to prove any credits such as were described in Item X, viz., credits to which the executors might be entitled by reason of an incorrect distribution of receipts or expenditures as between the trustees' accounts and the executors' accounts; whereupon the executors obtained leave of the circuit court to amend Item X so as to make it cover all alleged errors in and omissions from the account which, it was claimed, entitled the executors to a net credit of the amount stated in Item X. Evidence was then taken by the special commissioner as to such alleged errors and omissions and such evidence was included in his report. After a careful study of all these alleged errors, the commissioner found and reported that only $204.05 could be properly credited to the executors by reason of any incorrect distribution of the income as between the trustees' accounts and the executors' accounts; and since that was all that was included in the original Item X, as presented to the probate court, he found that the circuit court had no jurisdiction to allow the remainder of Item X, as amended, and recommended the disallowance of such remainder. This report and recommendation were followed in the decree.

For the reasons already stated in discussing Mrs. Kellner's blanket appeal items, we are of the opinion the decree as to Item X is correct. The amendment allowed in the circuit court introduced issues that were not tried in the probate court and upon which that court had entered no judgment of any kind. The appeal, therefore, did not give the circuit court jurisdiction to inquire into such matters.

## *Cross errors.*

Four cross errors are mentioned in appellees' briefs. The first relates to the alleged failure of the court to charge compound interest on the $7,500 charged against appellant by the circuit court for ''one-half of the $15,000 withdrawn by George Schmidt from his father's bank account.'' The fourth questions the findings of the decree respecting the existence of the partnership of K. G. Schmidt & Son. Those alleged cross errors are disposed of by what has been said regarding these matters.

By the second and third cross errors, appellees seek to have this court review that part of the decree which allows the executors compensation for their services, and that part which, it is said, fails to charge the surviving executor with moneys received by him as commissions on insurance premiums paid by the estate. We have read and carefully considered the arguments made by counsel as to these alleged cross errors, and we are of the opinion that no error was committed by the court respecting the matters therein mentioned. We approve the reasoning and conclusions of the special commissioner regarding these matters.

Furthermore, as this is an appeal by the executor, and as the errors assigned by him make no mention of the matter of executors' commissions or of commissions on insurance, cross errors as to the rulings of the circuit court upon such matters cannot properly be assigned on this appeal. (*Millard v. Harris, supra;*

*Kingsbury v. Powers,* 131 Ill. 182, 186.)

For the reasons stated, the decree of the circuit court is reversed as to the following items of the executor's account, to wit: (1) All items referring to advancements made to Barbara E. Kellner, to excess payments to her of income thereon, and to overpayment to her of partial distribution and interest thereon; (2) the item charging the executor with $7,500 as the "balance of $15,000 taken by George K. Schmidt from his father's bank account on Dec. 2, 1898," and the three interest items immediately following, viz., $16,821.00, $2,253.49 and $902.89; and (3) all the items, aggregating $15,850.49, charged to the executor by virtue of the so-called blanket appeal items of Mrs. Kellner. As to all such items the cause is also remanded with directions to the circuit court to restate the account as to all such matters in accordance with the views hereinabove expressed. In all other respects the decree of the circuit court with reference to the executor's final account is affirmed.

*Affirmed in part, reversed in part and remanded with directions.*

BARNES and GRIDLEY, JJ., concur.