Harriett Flynn Boyle, Appellant, v. John M. Smyth
Company et al., Appellees.

Gen. No. 31,302.

58

60

Opinion filed February 27, 1928.

EDWARD J. MCARDLE, JR., for appellant; EDWARD J. MCARDLE, SR., of counsel.

HAMILTON MOSES, for William P. Smyth, appellee.

MCCULLOCH & MCCULLOCH, for adult defendants except William P. Smyth.

WEIGHTSTILL WOODS, *pro se,* guardian *ad litem,* for minor defendants.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

The subject matter of this litigation is 729 shares of the capital stock of the John M. Smyth Company, a corporation, and certain dividends declared thereon.

Harriett Flynn Boyle, appellant, claims this property as sole legatee under the will of her sister, Mary Flynn Smyth. The children of Thomas M. Smyth and Mary Flynn Smyth, his wife, namely, William P. Smyth, Jane Ann Smyth, Rosalie Smyth and Thomas M. Smyth, claim this property by virtue of the power given to their father, Thomas M. Smyth, to dispose of the same under the terms of a certain trust agreement executed on November 24, 1913.

Harriett Flynn Boyle is the executrix of the will of Mary Flynn Smyth. She filed her supplemental bill, praying that the trust agreement of November 24, 1913, might be adjudged null and void; that the trustees thereof should be decreed to hold the stock for her as absolute owner; that she might have an accounting of the dividends, a construction of the will of Mary Flynn Smyth and other relief.

The defendants answered, denying the equity of her bill. William P. Smyth, Jane Ann, Rosalie, Thomas M., and the executors and trustees under the will of Thomas M. Smyth, and the trustees under the trust agreement, filed cross-bills averring that a receipt for the stock in question, delivered to Mary Flynn Smyth in her lifetime, had been issued without authority and

by mistake and certain dividends inadvertently and wrongfully paid to Mary Flynn Smyth. Their cross-bills prayed that it might be so adjudged and the property returned to the trust.

The cross-defendant answered, and after a hearing before the chancellor a decree was entered that the bill of Harriett Flynn Boyle, in so far as it prayed relief in her personal capacity, should be dismissed for want of equity, but that, as executrix of the estate of Mary Flynn Smyth, Harriett Flynn Boyle should retain the receipt which was dated December 31, 1919, subject to the further orders of the court relative to the application of the guardian *ad litem* for fees and to the interests of the minors during their minority; that, upon the completion of her duties as the executrix of Mary Flynn Smyth, Harriett Flynn Boyle, in so far as the said receipt remained "after the payment primarily there out of the debts of said Mary Flynn Smyth, deceased, and costs and expenses of administration in due course of administration and *guardian ad litem's* fees, transfer, set over, and assign and deliver the said receipt or certificate of interest or any interest so remaining, to the said William P. Smyth and the said minors, Thomas M. Smyth, Jane Ann Smyth and Rosalie Smyth, in equal parts."

The decree also ordered that the John M. Smyth Company pay to Harriett Flynn Boyle as executrix the sum of $29,889 for dividends on the 729 shares of stock, payable since the death of Mary Flynn Smyth; that dividends that might thereafter be declared upon the stock until distribution was made in the Estate of Mary Flynn Smyth, should be paid to Harriett Flynn Boyle as executrix, and that these dividends, in so far as the same were not required for payment of claims and costs and expenses of administration should be delivered to William P. Smyth and the three minors.

The complainant assigns as error the dismissal of her bill in so far as it asked individual relief. Her

appeal has been docketed in this court as general number 31302. The trustees under the agreement of November 24, 1913, the executors and the trustees under the will of Thomas M. Smyth, and John M. Smyth Company, jointly and severally appeal from the decree. Their appeals have been docketed in this court as general number 31303, *post*, and the causes have been consolidated for hearing.

The facts are not disputed. John M. Smyth Company, a mercantile corporation, was organized and successfully conducted by the late John M. Smyth in his lifetime. It has a capital stock of $1,000,000, consisting of shares of the par value of $100 each.

John M. Smyth was the father of Thomas M. Smyth, John M. Smyth, Jr., William P. Smyth, Mary A. Smyth Nelson, Jane F. Smyth Patera, Sarah B. Smyth Wales, Loretta Smyth Wehr and Ellen Smyth Nacey. These children survived him and each became the owner of 1,250 shares of the capital stock of the corporation. Differences arose among the eight children with respect to the management of the corporation. Three of the daughters, Sarah, Loretta and Ellen, disapproved of the views of the other five, Thomas M., John M., Jr., William P., Mary and Jane, and these five entered into the written trust agreement of November 24, 1913. In brief, this writing provided that these five, as owners of the stock of the corporation, describing themselves as "subscribers," agreed that they would turn over, deliver and deposit with themselves as trustees all of the capital stock of the corporation then owned or thereafter acquired by them during the life of the agreement; that the complete legal and equitable title was thereby transferred and assigned to the trustees for the purposes of the trust; that the trustees should cause the certificates of stock to be transferred upon the books of the corporation to the names of the trustees; that assignments of certificates, proxies and powers of attorney should also be given.

Each depositor was to receive a receipt for his certificate in the form specified. This receipt stated that it was not negotiable or transferable, but it was agreed, notwithstanding this provision, any subscriber might sell stock deposited to any other subscriber, subject to the terms and conditions of the agreement, and that in such case the trustees would issue a similar receipt to such purchaser. The dividends declared and paid upon the stock deposited were to be collected by the trustees and immediately paid to the receipt holders. Certificates for any stock dividends were to be deposited with the trustees to be held under the terms of the agreement and similar receipts issued therefor. Upon the termination of the trust the stock was to be delivered to the receipt holders. The trust agreement bound the trustees, their successors, and the subscribers, their executors, administrators, legal representatives and assigns. It was to continue in force for the period of 20 years and by later agreement extended at the option of the parties to 50 years. There were other provisions which are more specifically stated later.

On January 11, 1914, William P. Smyth, one of the subscribers, died testate leaving neither child not wife. His will directed that his beneficial interest under the trust agreement of November 24, 1913, should be held by his executor and trustee for the male children of his brother, Thomas M., and the male children of his sister, Jane F. Smyth Patera. Thomas M. Smyth was named as executor and trustee and qualified.

The only male children of Thomas M. Smyth are the defendant and cross-complainant William P. Smyth, and his brother, the defendant Thomas M. Smyth, Jr. The only male child of Jane F. Smyth Patera is the defendant Edward Smyth Patera.

Thomas M. Smyth departed this life testate June 29, 1917, and thereupon Frank G. Nelson succeeded to his trusteeship under the will of William P. Smyth.

Thomas M. Smyth left him surviving Mary Flynn Smyth, his widow, William P. Smyth and Thomas M. Smyth, his sons, and Jane Ann Smyth and Rosalie Smyth, his daughters, his only heirs at law and next of kin.

His will bequeathed and devised unto his "beloved children, * * * all of my property, real, personal and mixed, that I may be possessed of at the time of my death, subject to the further provisions of this will which creates a trusteeship for them." The will gave to his wife, Mary Flynn Smyth, free of inheritance taxes, for the period of her life, one-half of the net income from his estate and directed the balance to be divided equally among his children for their support and education, subject to the approval of his executors and trustees. He named as executors and trustees under his will Mary Flynn Smyth, John M. Smyth, Mary A. Smyth Nelson, Jane F. Smyth Patera and Frank G. Nelson. There were provisions that when his sons attained the age of 25 years they should automatically be made additional trustees. The will gave to the executors or trustees power by a majority vote to fill vacancies in their number and power to decide all questions of whatsoever nature affecting his estate.

The will specifically directed that his estate should be held together in trust until the death of his widow and thereafter during the lifetime of his daughters. There were other provisions which will be hereafter specifically set forth.

The will was admitted to probate; the executors and trustees accepted and qualified.

On January 29, 1923, Jane F. Smyth Patera died testate leaving her surviving Edward Patera, her husband, and Edward P. Smyth Patera and Jane Karolyn Patera, her children, her only heirs at law and next of kin. She devised to her husband, Dr. Edward Patera, that portion of the estate which would go to him under the laws of the State of Illinois and the rest to her

trustees to hold, invest, and pay such portion of the net income as they might deem proper for the support, maintenance and education of her children until May 1, 1940, at which time, if her children were living, her estate was to be turned over to them, or in the event of their death without issue, to her heirs. The will named as executors and trustees Dr. Edward Patera, John M. Smyth, Mary A. Smyth Nelson and Frank G. Nelson. At the time of her death Jane F. Smyth Patera held the receipt of the trustees under the agreement of November 24, 1913, for 2187½ shares of the stock of the John M. Smyth Company.

The husband did not retain any part of her estate for his own use. He transferred all his rights in her property under the will to trustees to pay the net income to himself during his life and after his death to the children of Jane F. Smyth Patera until the time provided in the trust agreement of November 24, 1913, for distribution of the trust estate, and then to deliver the same with accumulations thereof to the said children.

At the time of the execution of the trust agreement of November 24, 1913, all the parties to it knew of the intermarriage of Thomas M. Smyth with Mary Flynn Smyth. Thomas M. Smyth at his death owned and held the receipt of the trustees under said agreement in the form therein prescribed for 2187½ shares of the capital stock of the John M. Smyth Company.

On October 29, 1918, Mary Flynn Smyth filed in the office of the clerk of the probate court her renunciation of the will of Thomas M. Smyth. This renunciation states that she renounces all claim, benefit or interest under the will and elects to take in lieu thereof under the statute.

The surviving trustees under the trust agreement of November 24, 1913, on December 31, 1919, delivered to Mary Flynn Smyth a receipt or certificate of interest which recited that Thomas M. Smyth was the holder at the time of his death of a receipt for 2187½ shares

of the capital stock of the John M. Smyth Company issued under the agreement of November 24, 1913. The receipt recited the execution of the will of Thomas M. Smyth, the provisions therein for the benefit of his wife and her renouncement thereof. It further recited that by reason thereof she was entitled to one-third of the personal property of the decedent; that a partial distribution of the estate was about to be made; that the executors had delivered up for cancellation the receipt issued to Thomas M. Smyth in his lifetime and requested the trustees to issue in lieu thereof other receipts described in clause 4 of the trust agreement of November 24, 1913; that the trustees acknowledged that they received from Thomas M. Smyth in his lifetime and held for his wife, Mary Flynn Smyth, 729 shares of the capital stock of the John M. Smyth Company, which certificates were deposited and receipts issued therefor and held pursuant and subject to the agreement of November 24, 1913. This receipt also expressly stated that it was not negotiable or transferable.

On the same date Mary Flynn Smyth gave to the executors a written receipt which stated that the same should not be deemed or taken to be a waiver of any rights that she might thereafter have in relation to the trust agreement or in relation to the 729 shares of the capital stock, except as the instrument acknowledged a partial distribution in the estate of her deceased husband.

During her lifetime thereafter Mary Flynn Smyth received $16,163.14 as dividends from the 729 shares of the capital stock mentioned in the receipt, and she retained possession of the receipt until the time of her death. It thereafter came into the possession and is now in the possession of the complainant, Harriett Flynn Boyle.

Mary Flynn Smyth died at Chicago, Illinois, April 21, 1924, leaving her surviving her children, Wil-

liam P. Smyth, Thomas M. Smyth, Jane Ann Smyth and Rosalie Smyth, who are also the children of her deceased husband, Thomas M. Smyth, her only heirs at law and next of kin. She left a last will and testament which has been duly probated. The second clause thereof provides:

"I will, devise and bequeath all my property to my sister, Harriett Flynn Boyle, wife of James T. Boyle of Chicago. I make this provision for my sister to the exclusion of my children knowing that their material welfare is amply provided for in the wills of their uncle, William P. Smyth, deceased, and their father Thomas M. Smyth, deceased, and believing that the provision I here make for my children's aunt will be accepted by them as a small tribute to their aunt for the many acts of kindness and devotion she has shown them."

Suit was brought in the superior court of Cook county to contest this will. That suit has been dismissed. The will was admitted to probate on June 30, 1924. It named Harriett Flynn Boyle as executrix.

On April 1, 1925, John M. Smyth, Mary A. Smyth Nelson and William P. Smyth were the trustees under the trust agreement of November 24, 1913. On that date John M. Smyth and Mary A. Smyth Nelson were the sole survivors of the persons who signed the receipt or certificate dated December 31, 1919.

On that date the complainant made a demand in writing upon the surviving and then trustees of the trust agreement and upon the officers and directors of the John M. Smyth Company that they deliver up to her the certificate for said 729 shares of stock to be surrendered for reissue to her as executrix, or that the same should be canceled and surrendered to the company and that there be issued to her as executrix a new certificate therefor; that they account to her and pay over to her all dividends received on the stock after the death of Mary Flynn Smyth and all dividends re-

ceived after the appointment of William P. Smyth as trustee. She demanded the privilege of examining the books of the company, and she exhibited a copy of her letters testamentary.

(1) It is the contention of William P. Smyth and his minor brother and sisters that, as to the receipt for this stock, Mary Flynn Smyth died intestate. On this point the briefs of the parties cite innumerable cases.

They are agreed that the supreme object of the construction of a will must be to ascertain the intention of the testator as expressed in the will when not contrary to public policy or some rule of law. *Himmel v. Himmel,* 294 Ill. 557, 558; *McClure v. McClure,* 319 Ill. 271. They cite cases holding that every clause and provision of the will should be given effect (*Eyer v. Williamson,* 256 Ill. 540; *Wells v. Dalies,* 318 Ill. 301); that later clauses in the will control previous ones (*Drager v. McIntosh,* 316 Ill. 460); that the law favors the heirs and that heirs are not to be disinherited by conjecture but only by express words or necessary implication (*Smith v. Garber,* 286 Ill. 67, 72; *Pontius v. Conrad,* 317 Ill. 241); and that this rule will be applied, although the result is to cause the estate or part of it to pass as intestate property (*Miller v. Worrall,* 62 N. J. Eq. 776, 48 Atl. 586; *Lynes v. Townsend,* 33 N. Y. 558); that the presumption is that it is the testator's intention that the will should speak from death (*In re Thompson,* 217 N. Y. 111; *Peters v. Spillman,* 18 Ill. 370; *Woman's Union Missionary Soc. of America v. Mead,* 131 Ill. 338); that subsequent words not imperative and not equivalent to a command cannot control a plain and clear absolute bequest preceding them; that words cannot be supplemented or aided by extraneous facts or circumstances to import into the will an intention not expressed on its face (*Bingel v. Volz,* 142 Ill. 214; *Engelthaler v. Engelthaler,* 196 Ill. 230; *Greenwood v. Greenwood,* 178 Ill. 387), and that where there

is no ambiguity, the writing itself is the sole criterion of the intention it expresses. *McCormick v. Sanford,* 318 Ill. 544.

A consideration of these and many other cases demonstrates the utility of another rule expressed to the effect that decisions upon will construction cases are of less value as guides or authorities than is the case in any other subject of the law, and that each will must be construed in the light of its particular phraseology and the facts and circumstances surrounding the testator at the time of its execution. A few of the cases in which this thought has been expressed are *Boyd v. Strahan,* 36 Ill. 355, 259; *Miller v. Wick,* 311 Ill. 269, 277; *Alford v. Bennett,* 279 Ill. 375, 384.

Conflicting as many of the cases seem to be, we think it can be stated, as a result of a consideration of all of them, that evidence extraneous from the will may be received for the purpose of showing the intention of the testator as expressed in the language of the will, either for the purpose of identifying the particular property devised or the particular person to whom the devise is made. We think, too, the latest decisions of our highest court indicate a disposition to a more liberal interpretation of the general rule as to extrinsic evidence to the end that the intention of the testator may be ascertained, as also a disposition to hold that the statutory right of the heir to succession cannot be superseded except by testamentary disposition which is unambiguous and clear to that effect. *Desmarteau v. Fortin,* 326 Ill. 608; *Wahl v. Schmidt,* 237 Ill. App. 372.

Was it the intention of Mary Flynn Smyth to bequeath this stock to Harriett Flynn Boyle? It will be helpful in deciding that question to place ourselves in the position of the testator at the time she executed the will. This was five days after the will of her husband had been admitted to probate. We know from the words of the will who the persons were she deemed

herself obligated to consider. These were her sister, Harriett Flynn Boyle, and the testator's four minor children, two boys and two girls. The testatrix says that William P. Smyth, the children's uncle and a brother of their father, had made a will in which they were remembered. The will of the uncle provides for the boys out of the trust stock but it gives nothing out of it to the two girls, Jane Ann and Rosalie. We also know, because she says so, that she had in mind not only the will of Uncle William but the will of the father, Thomas M. Smyth, and presumably she was acquainted with its terms. This will created a trusteeship for the wife and the four children and gave to the wife one-half of the net income. The remainder of the income was bestowed upon the wife and afterwards it was all to go to the children. She had not at that time renounced the will. We think it is fair to presume that she did not at that time regard the property disposed of by the will of her husband as her own property. However clear the will may be in other respects, it is certainly ambiguous with respect to the amount of property which it was the intention of the testatrix to bestow on Mrs. Boyle, and is rendered so by the language which describes the bequest to her as a ''small tribute.'' This phrase may have been used to convey the idea that the property left to Mrs. Boyle was trivial in amount or that the testatrix thought that even a large amount of property would be a ''small tribute'' for the ''many acts of kindness and devotion'' shown by the aunt to the children. The extrinsic evidence does not clear up this ambiguity. The record is silent in so far as disclosing what was the nature of the acts of kindness which the testatrix thought would lead the children to approve of this bequest. All that is disclosed in this matter is what the will says, and that is that these acts of kindness were ''many.''

If we assume that the property here in controversy belongs to the children by virtue of the trust agree-

ment and appointment under the father's will, then the amount of property which the testatrix owned at the time she made her will could reasonably be said to answer to the description of "small." On the other hand, if the construction for which Mrs. Boyle contends is accepted, the bequest could not be considered as "small." In fact, the effect of this construction would be to give to the aunt substantially one-third of all the property which Thomas M. Smyth held in his lifetime, leaving two-thirds to be divided among the four children and giving to each of them one-sixth of the whole. In so far as the boys were concerned, it might possibly be said that the testatrix could do this "knowing that their material welfare is amply provided for in the wills of their uncle, William P. Smyth, deceased," for the boys were to receive very substantial legacies out of this trust stock under the terms of their uncle's will; but this would not be true as to the girls, who (if we accept the construction for which appellant contends) would receive practically only one-sixth of the property which the father intended they should have, while there would be bestowed upon the aunt, Mrs. Boyle, one-third of the entire amount. It is difficult to believe, considering all the language of this bequest and the circumstances, that it was the intention of the testatrix to thus discriminate against her minor children.

The will also states that the testatrix believes that the provision she was making for the aunt would be approved by the children. It is apparent by this clause that she was appealing to their mature judgment as to the righteousness of the disposition she was making. It is difficult to believe that the mother would think that the mature judgment of the children would accept and approve of a provision, the net result of which was to bestow upon her sister and their aunt twice as much of the whole property of the family as

either of the two daughters was to receive. It is undoubtedly true, as Mrs. Boyle contends, that the term "my property" or the phrase "all my property," is broad enough, as construed in many cases, to cover the entire estate of the testatrix and all property of which she might die either seized or possessed, but the will does not say so, and, when we put ourselves in the position in which the mother was, it is difficult to believe (considering the language of the will, the extrinsic documents to which she refers, and the whole situation in which she was placed) that such disposition was intended.

On the other hand, if we adopt the construction for which the children contend, namely, that by the phrase "all my property," the testatrix meant to bestow only the property which was recognized to be her own as distinguished from that which was her husband's, she might well have appealed to the children to accept such a provision as a "small tribute" to their aunt. Such gift she might well have made, knowing that the material welfare of her children had been amply provided for by the wills of their uncle and father. This construction does no violence to the language used by the testatrix. It removes the objection that these infant heirs would be entirely disinherited by an ambiguous and uncertain provision of the will of their mother. We think that the will, properly construed, does not indicate it was the intention of Mary Flynn Smyth to bestow the property represented by this receipt upon Mrs. Boyle.

However this may be, we think such a construction is rendered imperative by another consideration. By the terms of the trust agreement, the stock represented by the receipt which was held by Mary Flynn Smyth had been transferred expressly to trustees. She did not have the receipt at the time she made her will. She obtained it later, and from that date until she died it affirmatively appears that she had knowledge of its

contents. If we could assume that she had any right of property in this stock which it was possible for her to bequeath, we must in fairness also presume that she had knowledge of the title of that property. We must therefore assume that she not only had knowledge of the contents of her husband's will but that she knew of the terms and provisions of the trust agreement under which the stock had been deposited with the trustees and all legal and equitable title of the same transferred to them for the uses and purposes set forth in the trust agreement.

Irrespective of technical legal propositions, she could not suppose, either by virtue of the will of Thomas M. Smyth or by reason of her rights under the statute, that the property could be considered as hers.

It is apparent, therefore, that in order to reach the conclusion that Mary Flynn Smyth by the term "all my property" meant to confer the interest in this stock, we must conclude that at the time she made her will she was of the opinion that the trust agreement was either void or revocable. There is no evidence that she so regarded it. On the contrary, she received her receipt for an interest under the terms of the trust, and neither she nor any of the other interested parties, with the exception of Mrs. Boyle, has ever sought to revoke the trust agreement or assume an attitude of hostility towards it. The decree finds (and everything in the record indicates that the finding is right) that it is not to the interests of the minor defendants and cross-complainants to revoke that trust, and that no one with the right so to do has ever attempted to revoke it. Assuming, therefore, as we must, that Mary Flynn Smyth had knowledge of the trust at the time her will was executed and (as the evidence affirmatively establishes) that she had positive knowledge of the provisions of the trust after making her will and before her death, and that she at all times approved of and acted under its provisions, we think it is impos-

sible to construe her general devise of all her property as intended to cover this property which she may be presumed to have considered not her own and which in fact did not belong to her.

Mrs. Boyle further contends, however, that Thomas M. Smyth, notwithstanding any provisions of the trust agreement with reference to the legal title, was the equitable owner at death of the 2187½ shares of stock in the John M. Smyth Company which he had transferred to the trustees. She says that it does not matter that the writing says that it transferred the entire legal and equitable estate; that Thomas M. Smyth was as much the owner of the entire beneficial interest in the stock the day after and up to his death as he was the day before he executed the document; that the trustees took no right of ownership except the bare legal title; that they were "a mere depositary"; that the grant would be void without a beneficiary but that there was a beneficiary—"Thomas M. Smyth and no one else"; that he took the dividends; that he had a supposed power of sale; that he had the power to bequeath, and that, if clause 4, hereinafter quoted, had any effect, he had the power to appoint; that if he did not bequeath or appoint, his next of kin took it. Mrs. Boyle says, "That is surely about all the power, short of holding the legal title, a man can well have over property"; that if the language used in Thomas M. Smyth's will—"I bequeath all my property"—does not limit the will's operation to property actually his own, but because of its general character can extend to, and be held to be, an execution of a power, such application could exist only upon the theory that the testator was clothed with power to treat the stock in his will as his own; that if he could treat it in his will as his own, it would be treated in law as his own and has inhering to it all the incidents of property actually his to which the rights of his widow would attach.

She further argues that Thomas M. Smyth was clothed with a limited right to sell the stock; that he

had the property during life in the only way it could be enjoyed, namely, by a receipt of dividends declared on it, and that he could by his will at death dispose of it. Mrs. Boyle says that if it be conceded that clause 4 grants a power of appointment that the legal title to the stock being vested in the trustees, and Smyth having under the instrument the beneficial use of the stock for life, he was clothed with the entire equitable title and that a deed in his lifetime would have extinguished the power of appointment. In support of this contention she cites *McFall v. Kirkpatrick,* 236 Ill. 281; *Baker v. Wilmert,* 288 Ill. 434; *People v. Emery,* 314 Ill. 220; 1 Sugden on Powers (8th Ed.), 74, ¶ 26.

The crux of this contention is that the entire equitable interest of Thomas M. Smyth in the stock of the John M. Smyth Company was held by him at the time of his death as beneficial owner and passed under his will; and, since it was property of which he was possessed at his death, his widow's rights under the statute would attach thereto.

On the other hand, it is contended that the interest of Thomas M. Smyth was not such as would descend or pass by virtue of his will but by virtue of the provisions of the trust agreement, and that the interest of his wife, Mary Flynn Smyth, under the statute, would not therefore attach and she would not acquire under any circumstances any interest therein which could pass to Mrs. Boyle as her legatee.

That contention must be determined from the language of the trust agreement and the intention of the parties to that agreement as expressed therein, construed in the light of the conditions and circumstances under which the agreement was made. The language of the agreement does not leave any doubt as to the purpose for which it was executed. That purpose was to secure a wise and economical administration of the affairs of the corporation for the protection and benefit of the stockholders, and the reading of the agree-

ment leaves no doubt as to the means adopted to that end. Clause 1 states in part:

"Full and complete legal and equitable title to all of said stock is hereby transferred and assigned to said Trustees for the purposes hereof, and the said Trustees shall cause the certificates of stock so deposited hereunder to be transferred upon the books of said corporation to the names of the said parties of the second part, as Trustees, but the certificates evidencing such stock shall in all cases and at all times remain deposited with said Trustees."

It further provides for such proxies and powers of attorney as the trustees might deem necessary, and that the parties should receive receipts for the stock which should be held "pursuant and subject to the terms and conditions" of the agreement, and which receipts should state on their face that they are not negotiable or transferable. Clause 3 provides:

"Any subscriber hereto may sell stock deposited hereunder to any other subscriber hereto, subject to all of the terms, provisions and conditions of this agreement."

Clause 4 provides:

"In case of the death of any of said subscribers during the term of this trust, the right, title and interest of such subscribers under any such receipt held by such subscriber, may be disposed of by the valid last will and testament of such subscriber, or in default of such disposition shall pass by the laws of descent of the State of Illinois then in force, but subject to all the provisions and conditions of this instrument."

Clause 9 provides:

"In case of the death, resignation, refusal or inability to act of any one or more of said Trustees, the survivors or survivor shall have all the powers, rights, estates and interests granted to or conferred upon said parties of the second part, hereunder, and shall be charged with the duties and obligations herein mentioned."

What was the nature of the right, title or interest of Thomas M. Smyth under the terms of this agreement to the stock here in controversy? He expressly conveyed the title, complete, legal and equitable, and he completed that transfer by the delivery and assignment of his documents of title. The property was personal property. It was not subject to the statute of uses, and so long as there was no unlawful or fraudulent purpose, the parties had a perfect right to create exactly such interests as they might wish. The transfer conveyed every interest except such interest as was expressly reserved or necessary to the enjoyment of any such reserved right or interest.

This trust agreement speaks the intention of the subscribers thereto to place the legal and equitable title of this stock for a period of possibly 50 years beyond the power of any one of them, voluntarily or involuntarily, through operation of law, or otherwise, to remove the same from the control of the trustees. There can be no question of the right of Thomas M. Smyth to convey this property absolutely and that such conveyance would be valid as against any claim which his wife might make by virtue of the statute. It was not a conveyance which gave to Thomas M. Smyth the right to control the property and to resume the same at pleasure, as counsel for Mrs. Boyle contend. On the contrary, he gave up absolutely his right to control the property, and he entered into an agreement which made it absolutely impossible for him to resume control of that property at his pleasure. There was nothing fictitious about it. There was no sham or pretense about it. The conveyance was absolute and bona fide. There was no fraud about it, for it is undisputed on this record that Smyth retained an estate amply sufficient to meet his obligations to his creditors and to his wife and family.

It would unduly extend this opinion to discuss at length the facts in *McFall v. Kirkpatrick, supra;*

*Baker v. Wilmert, supra,* and *People v. Emery, supra,* upon which Mrs. Boyle relies. It must be sufficient to say that the estates there dealt with were legal estates in land, and that in each case they involved the construction of the rule in Shelley's case, which is applicable only to real estate and not to personal property, by the operation of which the court held that the entire legal and equitable title had become vested in the donee of the power. For perfectly obvious reasons, these cases have no application here.

In *People v. Emery, supra,* the court expressly said that there was no doubt that the grantor had made it plain that he intended that the heirs should take by purchase from him and not by descent from the life tenant under the rule in Shelley's case; that the rule in Shelley's case was a rule of law whose operation was independent 'of the intention of the grantor when the requisites of the rule existed; that the rule could not be evaded, however distinctly the intention to evade might appear. These cases are not applicable to the situation which exists on this record.

On the controlling question as to the nature of the interest of Thomas M. Smyth in and to the stock conveyed by him to the trustee, the minors and others contend that the same has been definitely settled by the case of *Merchants' Loan & Trust Co. v. Patterson,* 308 Ill. 519. Since all the parties rely upon this case (although the appellant urges that it is distinguishable) it may prove helpful to examine it with some care. In that case Patterson made a deed conveying premises to trustees who were to manage, etc., and reconvey at the termination of the trust or upon revocation thereof as therein provided. In case of death before its termination, conveyance was to be made to such person as he might have appointed by will and in default of such appointment to the child or children of the grantor, with a final limitation to the legal heirs according to the provisions of the statute.

After executing the trust the grantor married and a child was born. The grantor and his wife executed a trust deed conveying an undivided one-half interest, subject to other charges and incumbrances, to collect the income and pay to the wife during her lifetime, and in case of her death or dissolution of the marriage, to the infant son.

June 18, 1915, Patterson died, having executed a will which recited that his father and his wife had been provided for in prior agreements, in consideration of which she had released, etc. The Merchants' Loan & Trust Company, trustee in the original conveyance and the executor under Patterson's deed of October 23, 1914, filed a bill to construe the will and the trust, and the child and wife were made defendants thereto. She filed a cross-bill, setting up alleged marital rights. The court said that the deed of December 20, 1897, conveyed the fee to the grantee who took the legal title, the beneficiaries retaining the equitable ownership. The court further said:

"This interest of the grantor, Stewart Patterson, was an equitable fee,—the sole equitable ownership— qualified in only one particular. Before executing the deed of trust his estate was a fee simple, indefeasible. When he executed that deed he imposed upon the estate a certain condition in case he should die before the termination of the trust. That condition was, that in such event his equitable fee should cease and should not descend to his heirs, as it would otherwise have done, but should go to such person or persons as he might appoint by his will, or in default of such appointment, as the facts have actually happened, to his son. His estate after the execution of the deed of trust was an equitable fee simple, defeasible in the event of his death before the termination of the trust, and in that event to go over, by way of shifting use, to such person as he might appoint by will, or in default of appointment to the persons specified in the deed.

Upon his death before May 1, 1917, his estate in fee would come to an end, and the equitable ownership of the property would pass, not by descent to his heirs but by virtue of the deed of trust to the person whom he might have appointed by will, or if he had made no such appointment, to his children or grandchildren, or in default of any of these, to the persons who were his heirs. *None of these, however, would take by inheritance from him, but whoever would take any estate would derive it from the deed of trust.*"

While, as Mrs. Boyle points out, that case is in many other respects distinguishable, we think it is not distinguishable as to the form and effect of the trust which was created. The deed in the *Patterson* case is not distinguishable from the trust agreement in the *Smyth* case. The question at issue in the *Patterson* case was (as it is in the *Smyth* case here) whether the title in the event of the death of the grantor went over by way of shifting use to a person who might be named by the will of the grantor, or whether the title was such as would pass by descent from the grantor. The court said that the title passed by way of the instrument which created the trust; that the estate of Patterson came to its end at his death, and that the property did not pass by a subsequent conveyance nor by descent to his heir, but by virtue of the original deed of trust. The court also said in the *Patterson* case that the interest of the parties was indestructible by a conveyance of the grantor, and that he could, by exercise of his power, determine where the future interest should vest. It was held in the *Patterson* case that the parties in interest took under the deed of October 23, 1914. Here they take by virtue of the trust agreement of November 24, 1913. If the effect of the deed in the *Patterson* case was to cut off the interest of Mrs. Patterson, the effect of the trust agreement in the present case is to cut off the right, title and interest of Mary Flynn Smyth. In so far as the nature and quality of the es-

tates created are concerned, we think it is impossible to distinguish the *Patterson* case from this *Smyth* case, and it is worthy of note that the opinion of the court in the *Patterson* case distinguishes the case of *McFall v. Kirkpatrick, supra,* upon which Mrs. Boyle here relies.

Mrs. Boyle contends, however, that the trust agreement was void in part at least because of the clause in the receipt restrictive of alienation and because the whole trust agreement was illegal and void as contrary to public policy, and that, at any rate, the trust instrument was revocable on that ground and that it was in fact revoked by the death of Thomas M. Smyth. *Fisher v. Bush,* 35 Hun (N. Y.) 641; *Luthy v. Ream,* 270 Ill. 170; *People v. Emmerson,* 302 Ill. 300; *Venner v. Chicago City R. Co.,* 258 Ill. 523, and many other cases are cited and relied on.

*Babcock v. Chicago Rys. Co.,* 325 Ill. 16, has, we think, made it unnecessary to discuss the many cases cited. That latest expression of the opinion of the Supreme Court clearly shows that the trustees in an agreement of the kind which we must here construe are the legal owners of the stock and that no question, therefore, of revocable or irrevocable proxies can arise, and, moreover, that the question of whether a trust agreement of this kind is legal or illegal must be determined by the purpose for which it is made. See also *Thompson v. J. D. Thompson Carnation Co.,* 279 Ill. 54; *Babcock v. Chicago Rys. Co.,* 236 Ill. App. 360, all of which seem to sustain the general rule announced in 3 Cook on Corporations, § 622f, p. 2235, where, after a review of the cases, the author says:

"The above decisions seem to lead to the conclusion that a deposit of certificates of stock with trustees for a specified period of time, either with or without a transfer of the same to the trustees, is legal, and is not in violation of the usual statute against restraints on the alienation of personal property; and is not op-

posed to public policy as a restraint upon trade; and is not an implied fraud upon stockholders who are not allowed to participate; and is not an illegal separation of the voting power from the ownership of the stock; provided always that no actual fraud is involved in the transaction. In other words, such a pooling of stock is not illegal in itself, but, like all contracts, may be illegal if actual fraud is involved."

There is no claim in this case that there was any intention on the part of anyone to perpetrate a fraud of any kind. We have not overlooked, although we have not discussed, the contention of Mrs. Boyle that clause 4 is void or nonoperative because it expresses merely what the law decrees without it; that clause 4 does not operate *inter vivos* but that it takes effect at death; that it is therefore testamentary and is void, not being executed with the formalities of a will, and that the clause directing the interest to go by the laws of descent—if it can be considered at all—is a grant *inter vivos* to persons who cannot come into existence until the death of Thomas Smyth, for no one can be the heir or next of kin of a living person.

Most of the cases cited by appellant to these points are clearly not applicable, and the others must be considered as sufficiently answered by the opinion of the Supreme Court in *Merchants' Loan & Trust Co. v. Patterson, supra,* which we have already discussed.

That case must also, we think, be considered a sufficient answer to the further claim that clause 4 is not a power of appointment, because such a power must proceed from an owner to one not an owner, in support of which *Heinemann v. DeWolf,* 25 R. I. 243, and *Freme v. Clement,* 18 L. R. Ch. Div. 499, are cited. Any attempt to distinguish between the meaning of the word "power" and the word "disposition" would partake very much of the nature of a disquisition on the subject of how many angels could dance on the point of a needle. In 21 R. C. L. 772, we find:

"A power is defined as a liberty or authority reserved by, or limited to, a person to dispose of real or personal property for his own benefit, or for the benefit of others, and operating on an estate or interest, vested either in himself or in some other person; the liberty or authority, however, not being derived out of such estate or interest, but overreaching or superseding it, either wholly or partially"

The language of clause 4 of the trust agreement, giving the subscriber the right to dispose of his right, title and interest in case of death, cannot be construed as anything else than a power.

However, it is also contended that (even if it be conceded that the right to dispose of his interest at death may be construed to be a power) the will of Thomas M. Smyth fails to disclose that he exercised the supposed power, and in this connection we are cited to many cases holding that where the donee of a power may act in his own right and there is nothing in the will to indicate that he was acting under the supposed power, the law refers his acts in making a will, not to the power but to his own inherent right to dispose by will of his property.

That general rule is not disputed, and the fundamental question in construing a will to this end is that of intention. Technical language is not necessary, and the courts generally incline to a liberal construction. *Fairman v. Beal,* 14 Ill. 244. It is not necessary that the intention to execute appear by express terms or recitals in the instrument. *Goff v. Pensenhafer* 190 Ill. 200.

"The intention to execute the power, however manifested, whether directly or indirectly, positively or by just implication, will make the execution valid and operative."

Such was the rule laid down in *Funk v. Eggleston,* 92 Ill. 515, where the leading cases in England and America are reviewed.

The will of Thomas M. Smyth does not distinctly refer to the trust agreement nor to the power which we have held to be expressed therein. The record, however, shows the condition of his estate at the time his will was executed and at the time of his death. Aside from his homestead he had no property interest whatsoever except such interest as he had in the John M. Smyth Company through this trust agreement and another merchandising concern which was a subsidiary of the John M. Smyth Company. Remembering these facts, we notice that the will states:

"The intention of this will is to grant to my Executors and Trustees such broad powers as I would have were I living and endeavoring to conserve my estate and to foster in every possible way the lines of business in which I have been engaged and of which my estate is largely composed through stockholdings. * * *

"Any advances made to my beneficiaries for their support until such times *as the companies in which I am interested* are able to pay regular dividends are to be considered as loans and deducted from such amounts as may accrue in the future from these companies."

We think it cannot be doubted that the reference to the companies in which he was interested and his statement that he wishes to grant the trustees the same broad powers as he would have if he were living refer to and must be construed to be an execution of the power conferred upon him by clause 4 of the trust agreement. Indeed, in another clause of his will he grants to his trustees express power to join in any lawful trusteeship for the control of stock. We think the grant of these express powers, under circumstances such as existed at the execution of the will with reference to his estate, are inconsistent with any construction other than an intention to execute the power conferred upon him.

Mrs. Boyle contends, however, that the trust agreement must be set aside as being void under section 4 of the statute of frauds, Cahill's St. ch. 59, ¶ 4. While counsel for Mrs. Boyle attempts to distinguish the instant from the *Patterson* case, it is apparent that one of the questions at issue in that case was whether the estate created by Stewart Patterson was fraud upon the marital rights of his wife. It does not appear, however, from the opinion that the statute of frauds was there specially pleaded and relied on, as it is here, and the question is certainly not discussed in that case.

The principle there announced would seem to remove any possible foundation for such a contention here. It is not claimed, as we understand it, that the wife has any equitable claim against the personal estate of her husband during his lifetime, nor is there any doubt that he may convey that personalty or give it away at any time during his life free of all claims whatsoever of the wife on account of her marital rights. There are, of course, exceptions, such as the right to dower, homestead and widow's award, which by well-decided cases are held to be within the protection of the statute. Many of the cases upon which the appellant relies, such as *Padfield v. Padfield,* 78 Ill. 16; *Deke v. Huenkemeier,* 289 Ill. 148, we are convinced, after a careful consideration, do not sustain Mrs. Boyle's position but are clearly against it. Other cases cited are clearly distinguishable, as, for instance, *Emerson v. Bemis,* 69 Ill. 537, which is cited to the proposition that fraud will be inferred in a case like this, irrespective of the motives, good or bad. As a matter of fact, that case is authority for the proposition that it is a fraud for a husband in embarrased financial circumstances to convey property to his wife as against his pre-existing creditors. What application this unquestioned rule could have to facts in this case, we cannot understand. It is clearly distinguish-

able in the first place by the fact that at the time this trust agreement was entered into Mary Flynn Smyth, wife of Thomas M., under whom Mrs. Boyle claims, was not a creditor of her husband, nor, indeed, did she at that time have the right by law to claim that he was in any way neglectful of any marital right, including that of providing for the welfare of his family. The execution of this trust agreement was in that line, and for that purpose was apparently an efficacious and efficient means.

The statute of frauds has no application to facts such as appear in this case.

If we have correctly interpreted the case of *Merchants' Loan & Trust Co. v. Patterson, supra,* it follows that the trustees as the legal owners of the trust property had no right to deliver to Mary Flynn Smyth any part of the trust estate. She and they were bound by the terms and conditions of the trust agreement. Neither the children nor the trustees are estopped from claiming (as now by their cross-bill they claim) against the supposed devisee for the return of that property. There is no estoppel and there can be none as to the children nor, we think, as against the trustees, and it necessarily follows that the chancellor erred in decreeing that this property should be turned over to the executrix of the estate of Mary Flynn Smyth. The fact that in the estates of William Smyth and Thomas Smyth these receipts had been inventoried as the property of their respective estates could make no difference. We think it is apparent that the respective parties misapprehended and misunderstood their property rights and the nature and qualities of the estates with which they were dealing.

The renunciation of Mary Flynn Smyth was clearly ineffectual because there was nothing upon which it could operate. Her executrix is not entitled to the certificate nor to the dividends on the stock which have been declared since the death of Mary Flynn Smyth.

However, Mary Flynn Smyth should not, we think, equitably be deprived of the one-half of such dividends declared up to the time of her death, which it was the intention of her husband to appoint to her and which she would undoubtedly have received but for the mutual misapprehension and mistake in regard to the nature and qualities of the estate. She received only one-third thereof and her executrix is now equitably entitled to receive the remainder as property of the estate of Mary Flynn Smyth, and, subject to the payment of debts and costs of administration, Harriett Flynn Boyle will take the same as a legatee under the last will and testament of Mary Flynn Smyth. The rule applicable is stated in 2 Pomeroy's Equity Jurisprudence, § 849, as follows:

"Wherever a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, estates, duties, liabilities, or other relation, either of property or contract or personal *status,* and enters into some transaction the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests, or relations, or of carrying out such assumed duties or liabilities, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact."

This rule of equity has been approved by the Supreme Court of this State in *Moore v. Shook,* 276 Ill. 47, and in many analogous cases relief has been given by the courts. *Gordon v. Johnson,* 186 Ill. 18. In a quite recent case that rule was adopted and applied by this court in favor of a widow. See *Hanson v. Clark,* 246 Ill. App. 496.

It is further contended that, conceding there was a power of appointment, Thomas M. Smyth by the exercise of the same caused the property in question to become a part of his estate for the use and benefit of his creditors. While this doctrine expresses the gen-

eral rule in England, which has been followed by courts of high authority in this country (see *Re Harvey Estate,* 13 L. R. Ch. Div. 216; *Johnson v. Cushing,* 15 N. H. 298; *Brandies v. Cochrane,* 112 U. S. 344, *Clapp v. Ingraham,* 126 Mass. 200), the doctrine has been severely criticized, and, in so far as the briefs disclose, it has never been approved by the courts in this State. However, we do not think that question necessarily arises on the facts here appearing, since the right, if it exists, is only one in favor of creditors, and the record does not disclose that there is any unsatisfied creditor asking for any part of the estate of Thomas M. Smyth.

It follows from what has been said that the court erred in decreeing that the receipt for the 729 shares of the capital stock of the John M. Smyth Company should be turned over to the executrix of the estate of Mary Flynn Smyth, in decreeing that the executrix, Harriett Flynn Boyle, should receive the sum of $29,889, the amount of dividends declared upon said stock since the death of Mary Flynn Smyth, and in dismissing the cross-bill.

The decree is reversed and the cause remanded with directions to enter a decree in conformity with the views herein expressed. One-fourth of the costs in this court will be taxed against Harriett Flynn Boyle and three-fourths against John M. Smyth, Mary A. Smyth Nelson and William P. Smyth as trustees.

*Reversed and remanded with directions.*

O'CONNOR and McSURELY, JJ., concur.