## Max M. Kann, Appellant, v. Barnet L. Rosset et al., Individually and as Trustees, Appellees.

### Gen. No. 41,159.

Denis E. Sullivan, J., dissenting.

Opinion filed November 20, 1940.   Rehearing denied December 11, 1940.

Decker, Golden & Silber, of Chicago, for appellant; Herbert Decker and Seymour R. Blankstein, of Chicago, of counsel.

J. Robert Cohler, of Chicago, for appellees; James J. Kelly, of Chicago, and J. Robert Cohler, of counsel.

Mr. Justice Burke delivered the opinion of the court.

Straus Brothers Investment Company sold to the public bonds in the sum of $420,000, bearing interest at 6½ per cent per annum, secured by a trust deed dated March 15, 1926, from Elmgate Manor Building Corporation to Herman S. Strauss, as trustee. The property consists of a four-story apartment building, located at the northeast corner of Elmwood avenue and Main street, Evanston, Illinois, containing 10 stores and 57 furnished apartments. Default was made and foreclosure proceedings were instituted by the trustee in the circuit court of Cook county on January 13, 1931. On January 31, 1931, a committee was appointed on behalf of the bondholders of all bonds sold or distributed by or through Straus Brothers, which committee was changed from time to time by virtue of deaths or resignations, and culminated in the present committee of Barnet L. Rosset, Charles J. Young, Earl G. Krumrine, Louis J. Borinstein and A. D. Plamondon. The rights and duties of the respective parties are defined in the deposit agreement, dated January 31, 1931. On or about March 13, 1931, the committee called the Elmgate Manor bonds for deposit and forwarded to the bondholders an abstract of the deposit agreement. The Philip State Bank & Trust Company was named as depositary. The deposit agreement was prepared by the committee. Max M. Kann is an original purchaser of three bonds in the principal sum of $1,000 each. He deposited his

bonds with the committee and thereby became a party to the deposit agreement. He received a certificate of deposit in exchange for his three bonds. A copy of the deposit agreement was at all times kept on deposit with the depositary and available for inspection by any bondholder during business hours. On or about November 16, 1931, the committee forwarded a communication to the bondholders inclosing a resume of a proposed plan of reorganization purportedly pursuant to the powers and provisions of the deposit agreement. The depositing bondholders were given a period of 20 days in which to dissent from the plan and to withdraw their bonds. Due to the necessity of awaiting the expiration of certain redemption rights, and also due to the adverse real estate financing market, the carrying out of the plan was delayed. On April 4, 1933, the committee advised the bondholders that the original plan had been amended and gave the depositing bondholders a second opportunity to dissent and withdraw their bonds upon the conditions therein stated. Because of the dissolution of the Philip Trust & Savings Bank, the Metropolitan Trust Company was designated as depositary. Due to the difficulty of obtaining a reorganization loan for a sufficient sum, it became necessary to alter the plan in certain respects. A reorganization loan in the sum of $49,000 was procured, and the proceeds used for the purpose of paying the cost of acquiring the various interests and expenses in connection with the foreclosure and reorganization upon certain terms and conditions. On April 27, 1933, a decree of foreclosure was entered, finding that the amount of unsubordinated bonds outstanding was the principal sum of $407,500. On June 15, 1933, a master in chancery sold the property to a nominee of the boldholders' committee for the sum of $49,000, which sale was made pursuant to the plan of reorganization, dated November 10, 1931, as amended April 4, 1933. At the time the master sold the property, the commit-

tee had on deposit unsubordinated bonds in the principal sum of $384,500 out of an outstanding bond issue of $407,500 in unsubordinated bonds, and $12,500 in subordinated bonds. On June 27, 1933, the master in chancery sent to all of the bondholders, by registered mail, a letter which stated that the premises had been sold to a nominee for the committee; that the proportionate share to which the nondepositing bondholders would be entitled would amount to approximately $9.81 per $100 principal amount of indebtedness represented by the bonds of the issue; that the bid was made pursuant to a plan of reorganization described in the letters to the bondholders by the committee dated November 16, 1931 and April 4, 1933; that the bondholders who had not deposited their bonds would have a further opportunity to do so before August 15, 1933, and that the report of sale would be presented to the court for confirmation on July 7, 1933. On July 11, 1933, the court entered a decree confirming the sale and finding that there was a deficiency. This decree also retained the trustee in possession during the period of redemption. The decree recited that the court examined the master's report of sale and distribution, the account and report of the trustee and the petition of the complainant. The decree found:

"That said Bondholders' Protective Committee has submitted a plan of reorganization to all known bondholders and which plan of reorganization provides for the formation of a new corporation for the purpose of acquiring title to the mortgaged property subject only to a first mortgage given to secure a loan sufficient in amount to cover unpaid taxes and all other expenses involved in and about these proceedings and the said reorganization; that under said plan of reorganization the present holders of the first mortgage bonds secured by the trust deed foreclosed in this cause will receive a voting trust certificate representing the ownership of one share of no par value stock of the said proposed

corporation for each One Hundred Dollars in principal amount of unpaid bonds deposited by the respective depositors; that three (3) voting trustees, one of whom will be a bondholder, will be selected to represent the bondholders, and the certificates issued to said bondholders will represent all of the capital stock of the said corporation; the proceeds and avails derived from the operation of the said premises and the proceeds derived from a sale of the corporate property will, after the payment of the said refinancing mortgage or other indebtedness of the corporation, be distributed to the depositing bondholders as more particularly set forth in the letter attached to the complainant's petition filed this day and marked Exhibit 'A'.'' The decree also found that the bid was fair. The plan was concluded without dissent from a single depositor, and no objections were filed with the committee or any other person. The committee formed an Illinois corporation known as the Main-Elmwood Building Corporation, to own and operate the premises and redeem from the first mortgage foreclosure sale, and caused the title to the real estate and the personal property therein located to be conveyed to the corporation, and caused the corporation to execute a first mortgage trust deed, together with notes secured thereby in the sum of $49,000. The committee caused the voting trustees and three employees of the committee to subscribe for 3,934 shares, being all of the shares of the corporation, and had 3 shares issued in the names of the three trustees individually, and the balance of 3,931 shares issued in the name of the three trustees, as trustees. These shares were issued on the basis of one share for each $100 face amount of bonds deposited with the committee. The committee caused to be prepared on August 1, 1933, a voting trust agreement, and thereunder caused to be issued to each depositing bondholder, Main-Elmwood Building Corporation common stock trust certificate. Max Kann ac-

cepted his trust certificate under the plan and made no complaint or objection until December 18, 1936, when he served a written notice on the trustees of the corporation and the Metropolitan Trust Company, depositary, demanding the "return of the certificate or certificates of stock in said Main-Elmwood Building Corporation evidenced thereby and heretofore transferred to said trustees by the undersigned and owned by him, or demands new certificates of stock to be issued to him in his name, and hereby withdraws from the alleged Trust Agreement dated as of August 1, 1933, wherein above are named as trustees and the Metropolitan Trust Company is named as agent of said trustees, and demands that said Trust Agreement be cancelled and revoked, said agreement terminated and that said trustees immediately make full and complete accounting. The undersigned further notifies you that he shall no longer be bound by the terms of said trust agreement and demands that said trustees refrain from voting his shares of stock or any shares of stock of any other shareholders." Trust certificate No. 183 issued to Kann, which is in the same form as all the other trust certificates, reads:

"MAIN-ELMWOOD BUILDING CORPORATION
COMMON STOCK TRUST CERTIFICATE.

"This certifies that there has been deposited with the undersigned as Trustees under the Trust Agreement hereinafter mentioned, a certificate or certificates for thirty shares of the Common Capital Stock of MAIN-ELMWOOD BUILDING CORPORATION, a corporation organized under and by virtue of the laws of the State of Illinois and that Max M. Kann or assigns is entitled to all the benefits and interests specified in said Trust Agreement arising from the deposit of said shares, all as provided in and subject to the terms of said Trust Agreement a copy of which is on deposit with Metropolitan Trust Company of Chicago, Illinois,

as Agent of the Trustees and to which agreement reference is hereby made. Until the termination of said Trust Agreement the registered holder hereof or assigns is entitled to receive payments equal to the amount of the cash dividend or dividends, if any, collected by the undersigned Trustees, or their successors in trust, upon the above number of shares of Common Capital Stock of said Corporation, less taxes, charges and other expenses permitted to be deducted under the terms of said Trust Agreement. Until the Trustees shall have delivered the stock, held by them under said Trust Agreement, to the holders of Trust Certificates or to an agent or to said Corporation as specified in said Trust Agreement, the Trustees, or their successors in trust, shall possess and shall be entitled to exercise all rights and powers of every nature of and as absolute owners of said stock, including the right to vote thereon and to execute consents with respect thereto for every purpose, except as in said Trust Agreement provided with respect to the authorization of the sale of all or substantially all of the property and assets of said Corporation; it being expressly stipulated that, except as aforesaid, no voting right passes to the above registered holder hereof or any assigns by or under this certificate or by or under any agreement, expressed or implied.

''This certificate is issued under and pursuant to, and the rights of the holder hereof are subject to and limited by, the terms and conditions of a certain agreement dated as of the 1st day of August, A. D. 1933, between holders of this and similar certificates and BARNET L. ROSSET, CHARLES J. YOUNG and LOUIS J. BORINSTEIN and their respective successors, as Trustees. The said Trust Agreement shall terminate on the 31st day of July, A. D. 1943, or at such earlier date as a majority of the Trustees, in their discretion, may determine.

''This certificate is transferable only on the books of the Trustees by the registered holder hereof in

person or by attorney duly authorized according to the rules established for that purpose by the Trustees and on surrender hereof. Until so transferred, the Trustees shall be entitled to and may treat the registered holder as owner hereof for all purposes whatever, and shall not be bound by notice, expressed or implied of any equities which may exist with relation to such certificate.

"IN WITNESS WHEREOF, the Trustees have caused this certificate to be executed on their behalf by their duly authorized agent.

"Dated August 15, 1933.

"BARNET L. ROSSET,
CHARLES J. YOUNG,
LOUIS J. BORINSTEIN,
          "*Trustees.*
               "METROPOLITAN TRUST COMPANY,
                    "*Agent of the Trustees.*
               "By Daniel J. Healy,
                    "*Its Authorized Officer.*"

Trust certificates were issued to 402 separate holders.

On December 29, 1936, plaintiff filed his complaint in the circuit court of Cook county in behalf of himself and "of all other parties similarly situated who may desire to join in and contribute to the expense of this proceeding." It does not appear that any other parties joined in the proceeding. The complaint prayed that the court declare the voting trust agreement invalid; to direct the trustees and the building corporation to issue to and in the name of plaintiff, respective shares of stock of the Main-Elmwood Building Corporation deposited with said trustees; to enjoin the trustees from voting upon any and all of the shares of said stock deposited under said trust agreement; to secure for plaintiff the right to examine or receive a list of the beneficiaries under said trust; for an accounting; or, in the alternative, if the court de-

clare said trust agreement valid, that the plaintiff be allowed to withdraw therefrom pursuant to the terms of said agreement, and that said trustees and said building corporation be directed to issue to and in the name of the plaintiff, respective shares of stock so deposited, and for other relief as set forth in said complaint as amended. Defendant answered and denied that the plaintiff was entitled to any relief. The cause was referred to a master in chancery. The plaintiff took the deposition of Louis J. Borinstein, one of the trustees. Thereafter, the order of reference to the master was vacated by agreement of the parties and the cause was heard by the chancellor upon a stipulation. The stipulation provides that "all issues raised by the pleadings herein, other than those specified in this stipulation, shall be disregarded and the court shall pass upon the following issues only:

"(1) Is the voting trust agreement set forth verbatim in and by the complaint of plaintiff, a valid, legal agreement, or a void or voidable agreement?

"(2) Is plaintiff entitled to examine or receive a list of the holders of common stock trust certificates issued pursuant to the aforementioned voting trust agreement?

"(3) In the event that the court holds that said voting trust agreement is not invalid, or is not invalid in toto, does the plaintiff have a right to withdraw from said voting trust agreement and to receive in exchange for his common stock trust certificate shares of the capital stock of the Main-Elmwood Building Corporation?" Much of what is stipulated has been set up in the statement of the case. In addition to what has been stated, the parties also stipulated that Barnet L. Rosset was, in the year 1933, and is president of the Metropolitan Trust Company, owning and having a substantial financial interest in said company, and is the principal executive officer thereof; that Charles J. Young and Louis J. Borinstein have

never had any financial interest in the Metropolitan Trust Company and have never been officers, directors or employees thereof; that Metropolitan Trust Company has, subsequent to August 1, 1933, been paid for acting as agent of the trustees under the trust agreement, an annual fee for registering, transferring and maintaining accounts of $250 for the first 250 accounts and 50 cents for each additional account and a minimum fee for custody of the corporate stock of $50 per annum; that payments to the Metropolitan Trust Company since August 1, 1933, for acting as agents of the trustees under the trust agreement were as follows:

| | |
|---|---|
| Nov. 5, 1934 | $479.50 |
| Aug. 1, 1935 | 304.50 |
| Jul. 28, 1936 | 364.50 |
| Oct. 8, 1936 | 10.00 |
| Jun. 23, 1937 | 10.00 |
| Jul. 15, 1937 | 361.50 |
| Aug. 1, 1938 | 351.00 |

that the three trustees have been paid fees subsequent to August 1, 1933, in the aggregate sum of $1,000 per year for their services as such trustees, but have received no additional amounts for acting as directors and officers of the Main-Elmwood Building Corporation; that plaintiff has offered to pay any amount which the court may find due to the trustees under the trust agreement, in the event he is permitted to receive shares of capital stock of the Main-Elmwood Building Corporation in exchange for his common stock trust certificates. The parties also stipulate that a copy of the deposit agreement was at all times after the organization of the bondholders' committee kept on deposit with the said committee and was available for inspection by any bondholder; that after the voting trust agreement was drafted, a copy thereof was kept on deposit with the depositary of the bondholders' committee and agent of the trustees and was available for

inspection by any bondholder. The court entered a decree dismissing the complaint for want of equity, to reverse which this appeal is prosecuted.

The first point urged by plaintiff is that the committee had no authority to create or formulate the terms of the voting trust agreement. He argues that the powers of the committee emanate and depend upon the terms of the deposit agreement, and that these powers cannot be expanded or enlarged by the committee. He also maintains that the plan would be the means by which the bondholders acquired ownership of the real estate and personal property which had theretofore secured bonds owned by them, and that this plan would be completed upon the organization of a corporation, the acquisition of the title to the *res* in the name of the corporation and the issuance of capital stock to the bondholders in exchange for their bonds, and that such must have been the contemplation of the committee in preparing the deposit agreement; that if they had intended a different method or plan, they could and would have employed language authorizing the committee to create a voting trust and giving the voting trustees the right to subscribe for the stock of a corporation to be organized and to issue the stock to the trustees, and that they could likewise have provided specifically that the stock should not be distributed to the depositing bondholders. He declares that the deposit agreement was drafted by the committee and invokes the well-established rule that where an ambiguity exists, such agreement must be construed most strongly against the parties who prepared it. On the other hand, defendants assert that the trust agreement was authorized by the terms of the deposit agreement, and that it was accepted and subsequently ratified. We have carefully read the stipulation, the testimony of Louis J. Borinstein and all the exhibits, and are convinced that the committee had the authority to promulgate the plan of reorganization, as

amended, and to submit the trust agreement and put the plan into operation. The record clearly shows that plaintiff was acquainted with the trust agreement. He received a trust certificate. The language of the trust certificate is clear. It is stipulated that the trust agreement was on deposit and that plaintiff and all the other bondholders could examine the same. The plan as amended was submitted to the bondholders. They were also notified by the master in chancery that the approval of the sale would be considered by the court. The decree confirming the sale shows that the court found that the price was fair and that the bondholders' protective committee had submitted a plan which provided for the organization of a corporation which would acquire the title, and the selection of three voting trustees, and the issuance of certificates to the bondholders. It is well established that in order to approve a sale, coupled with a plan, there must be two requisites, namely, a fair plan and a fair sale. The court in approving the sale necessarily approved the plan. Plaintiff did not dissent from the plan. He accepted the certificate, which showed on its face that the trust agreement might not terminate until July 31, 1943, and he took no action until December 18, 1936. He had an opportunity to be heard before the court on July 7, 1933. We are of the opinion that his actions showed a ratification of the action of the committee in adopting the plan and the trust agreement, and that such ratification was made while he had full knowledge of the facts.

The second point presented is that the trust agreement separates voting rights from ownership and is against public policy. Plaintiff does not contend that all voting trust agreements are invalid *per se,* but that their validity depends upon the purpose thereof. In support of his position he cites *Warren v. Pim,* 65 N. J. Eq. 36; *Warren v. Pim,* 66 N. J. Eq. 353; *Gray v. Bloomington & Normal Ry.,* 120 Ill. App. 159; *Venner*

*v. Chicago City Ry. Co.*, 258 Ill. 523; *Luthy v. Ream*, 270 Ill. 170. Defendants lean heavily on the cases of *Babcock v. Chicago Rys. Co.*, 325 Ill. 16, and *Boyle v. John M. Smyth Co.*, 248 Ill. App. 57. He also cites section 30 of the Corporations Act (par. 157.30, ch. 32, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 32.030]) which reads: " . . . Shares standing in the name of a guardian, conservator, or trustee may be voted by such fiduciary, either in person or by proxy, but no guardian, conservator or trustee shall be entitled, as such fiduciary, to vote shares held by him without a transfer of such shares into his name." We have carefully studied the cases and are of the opinion that the voting trust set up under the plan and the trust agreement does not constitute an illegal separation of the voting power from the ownership of the stock. We also find that the record does not show that the voting trust was induced by fraud. We conclude that as the trustees are the legal owners of the stock, there is no separation of the voting rights from ownership.

The third point argued by plaintiff is that the voting trust agreement contravenes and violates section 3 of Article XI of the Constitution of the State of Illinois, which reads:

"The general assembly shall provide, by law, that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected, or to cumulate said shares, and give one candidate as many votes as the number of directors multiplied by the number of his shares of stock shall equal, or to distribute them on the same principle among as many candidates as he shall think fit; and such directors or managers shall not be elected in any other manner." This contention is answered by our views on the previous point. We have held that the voting trust is valid. Therefore, the trustees are the stockholders of

the corporation and there is no violation of the constitutional provision quoted. As a fourth point plaintiff states that equity will penetrate beyond the covering of form and look at the substance of a transaction and treat it as it really and in essence is however it may seem. That statement is not challenged. The contention here made that in equity the trust beneficiaries are to be regarded as stockholders, was also urged in the *Babcock* and *Boyle* cases and rejected. The trust agreement is valid, and therefore, the trustees are in fact and in law the stockholders of the corporation.

The fifth point advanced is that documents prepared by the committee and trustees (being the deposit agreement and the trust agreement) must be most strongly construed against the parties preparing the same and in favor of the beneficiaries. We believe that this point has been fully covered in our discussion of the other propositions. Plaintiff asserts that the voting trust agreement lacks mutuality and is unilateral. There is no merit to this point. Plaintiff also asserts that he is entitled to examine or receive a list of common stock trust certificates. The trust agreement by which plaintiff is bound provides that the holder or holders of trust certificates representing not less than 50 shares of capital stock of the corporation shall have the right at any reasonable time upon written notice to the trustees, stating the purpose therefor, to examine the list of the then holders of stock certificates, provided however, the trustees may withhold such right from any such person in their discretion. This provision does not seem unreasonable. However, we believe that under a proper showing a certificate holder would be entitled to make a list of the certificate holders. An examination of the record does not indicate that the plaintiff made any showing as to his purpose in procuring a list of the certificate holders. Therefore, this point is without merit. Under this heading plaintiff also argues that he is entitled to an

168

accounting. The stipulation on which the case was tried has eliminated consideration of this issue.

Finally, plaintiff insists that under the terms of the trust agreement, in the event we should declare said agreement valid, the beneficiaries are entitled to withdraw therefrom and have the shares deposited thereunder represented by the said trust certificates issued in their respective names upon paying to the trustees such amount as may be found due them, if any. We have held that the trust agreement is valid and that it is binding upon the plaintiff. We do not agree with him that paragraph 13 of the trust agreement permits him to withdraw therefrom upon offering to pay his share of any amounts due to the trustees. Under paragraph 7 the certificate holders are to receive the stock on July 31, 1943, or at such earlier date as a majority of the trustees shall determine. We cannot sustain the argument of plaintiff that he is entitled to withdraw from the trust agreement.

Before the case was assigned to this division, the First Division denied a motion by defendants to dismiss the appeal. A motion to reconsider the motion to dismiss the appeal was reserved to hearing. The basis of the motion is that the rules of the Supreme Court require that the plaintiff include in the record, either (a) a report of the proceedings at the trial, or (b) in lieu of such report of the proceedings at the trial, a written stipulation containing the agreement of the parties hereto upon a statement of the facts material to the controversy. The case was tried by the chancellor on a stipulation, which stipulation is in the record. Therefore, the record before us discloses everything that the chancellor had. Defendants' motion to dismiss the appeal is denied.

For the reasons stated, the decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*

HEBEL, P. J., concurs.
DENIS E. SULLIVAN, J., dissents.